*1123
 
 OPINION
 

 Per Curiam:
 

 In August 1989, appellants, Cebe Loomis and her sons Andrew Loomis, Christian Loomis, and Just Loomis (collectively, “the Loomises”), enlisted the services of respondent Lange Financial Corporation (“LFC”), a California brokerage firm, to find a buyer for four parcels which the Loomises owned in downtown Reno. The Loomises entered into a marketing agreement with LFC for a nine-month term beginning August 28, 1989, and concluding on May 28, 1990. The marketing agreement, an LFC standard form contract, provided that the Loomises would pay LFC a ten percent commission on the sale of the properties in the event that the Loomises received an offer on the properties at or in excess of $2,750,000.00.
 

 William W. Lange, the president and sole shareholder of LFC, negotiated and signed the marketing agreement on behalf of LFC. LFC assigned John Valentine to market the properties. When the marketing agreement was executed, neither Lange nor Valentine was a licensed real estate broker in the State of Nevada, LFC was, however, a properly-licensed corporate broker in Nevada.
 

 On May 22, 1990, several days before the listing was to expire, Republic Financial Corporation (“Republic”) offered to purchase the Loomises’ properties for $2,750,000.00. The offer, telefaxed to the Loomises by Valentine, Was signed by Lange.
 
 [1]
 

 What took place in the interim, between the communication of the Republic offer on May 22 until the Loomises’ purported acceptance of the offer on June 2, is the subject of much disagreement between the parties.
 

 Lange testified that on May 30, 1990, he sent to Andrew Loomis, by regular mail, a letter “rescinding” the May 22 Republic offer. Andrew Loomis testified that he never received the May 30 letter. Valentine admitted that he never saw the May 30 letter. Lange also testified that on May 31, 1990, he wrote Valentine stating that he was withdrawing the Republic offer. Valentine did not see the May 31 letter until mid-June 1990.
 

 Lange also testified that part of the money to fund Republic’s purchase of the Loomises’ property was to come from Adrian Fu, who had previously made offers to purchase the Loomises’ property.
 

 Valentine met with Reno Mayor Peter Sferrazza on June 7, 1990, in an attempt to sell the Loomises’ properties to the City of
 
 *1124
 
 Reno. Sferrazza testified that Valentine told him the Loomises’ properties were already in escrow with Republic, “and that his partners had already entered into this purchase agreement and that that very day they were going to be putting down the down payment with the escrow company. And he showed me some escrow instructions which showed the price, the purchase price to be 2.75 million.” Sferrazza also testified that Valentine showed him a check in the sum of $27,500.00. Finally, the Mayor testified that, at the time of the meeting, it “wasn’t clear at all” to him whether Republic would “just step aside and we’d deal directly with the owner, of if ... we would buy it from Republic.”
 

 Valentine denied having shown Sferrazza the contract, denied disclosing the $2,750,000.00 purchase price, and could not remember whether or not he had the $27,500.00 check in his possession at the time of the meeting. Valentine never deposited the $27,500.00 earnest money into escrow, nor made any effort to compel Republic to increase the $27,500.00 to $275,000.00 within one business day of buyer’s acceptance of the June 2, 1990, offer, as called for in the purchase agreement. Valentine admitted being aware of the requirement under NRS 645.310 that a broker deposit earnest monies he or she has received for a client into a trust account maintained at a Nevada bank. At some point, which Valentine could not recall, he returned the check to Lange.
 

 In June 1990, Allright Sierra Parking (“Allright”) made an offer to purchase the property for $2,750,000.00. The Loomises rejected the offer. In September 1990, Allright offered to purchase a portion of the property, a triangle-shaped site and to lease another portion of the property. The Loomises accepted the offer and the deal closed in November 1990.
 
 [2]
 

 On August 8, 1990, the Loomises filed a complaint against Republic, LFC, Lange, Valentine, and Hallie Smiley, an employee of LFC, and LFC counterclaimed for payment of a commission on the sale of the triangle piece. After a lengthy trial, the jury found in favor of the Loomises and against Republic Financial Corporation for breach of contract and for breach of the covenant of good faith and fair dealing, against LFC for breach of fiduciary duty, and against Lange, Smiley and Valentine, for
 
 *1125
 
 breach of fiduciary duty. The jury assessed actual damages in the amount of $18,500.00. On LFC’s counterclaim, the jury found that LFC was the procuring cause of the sale to Allright and awarded LFC damages in the sum of $95,000.00.
 

 On February 11, 1992, the trial court awarded LFC attorney’s fees in the amount of $13,331.00 and costs in the amount of $7,601.15 pursuant to a clause in the brokers’ commission agreement making fees and costs recoverable to the “prevailing party.”
 

 The Loomises appealed; Republic and the real estate brokers cross-appealed.
 

 Enforceability of the Liquidated Damages Provision
 

 The purchase agreement entered into between the Loomises and Republic Financial Corporation contained a liquidated damages clause which provided that, in the event of breach by Republic, ten percent of the purchase price would be deemed “liquidated damages” payable to the Loomises. At trial, Republic contended that the liquidated damages provision resulted in a penalty and was thus unenforceable. The district court, rather than ruling on the issue, submitted the question of the validity of the liquidated damages provision to the jury. The jury answered the special verdict form as follows: (1) Republic breached its purchase agreement with the Loomises; (2) actual damages were ascertainable; (3) actual damages were assessed in the amount of $18,500.00; and (4) liquidated damages were disproportionate to actual damages and therefore a penalty. The Loomises contend that the district court erred in holding that the validity of the liquidated damages clause was a question of fact for the jury. Because each of this court’s prior decisions regarding the validity of liquidated damages clauses have been in bench trials, the issue of whether in a jury case the judge or the jury is the proper decision-maker on this issue has never arisen.
 
 See, e.g.,
 
 Joseph F. Sanson Investment v. 286 Limited, 106 Nev. 429, 795 P.2d 493 (1990).
 

 The vast weight of authority supports the conclusion that the “[t]he non-enforceability of penalties and forfeitures is a limitation on the freedom of contract and is based upon the notions of public policy held by courts of equity.” 5 Arthur L. Corbin,
 
 Corbin on Contracts
 
 § 1055 (1964). The essentially equitable nature of this limitation has been implicitly recognized in Nevada.
 
 See, e.g.,
 
 Mosso v. Lee, et al., 53 Nev. 176, 186, 295 P. 776, 780 (1931); Lucich v. Medin, 3 Nev. 93, 99 (1867); Cox v. Smith, 1 Nev. 161, 172 (1865). We conclude that the determination of whether a liquidated damages clause is
 
 enforceable
 
 is
 
 *1126
 
 equitable in nature and is to be decided as a matter of law by the court and not the jury. Accordingly, the district court erred in allowing the jury to make that determination; we proceed to construe the liquidated damages provision in this case as a matter of law.
 

 The Loomises contend that the liquidated damages provision was put into the purchase agreement by Republic and that the percentage provided in the purchase was not believed by Republic to be, nor was it in fact, unfair, inequitable or disproportionate to the amount of actual damages suifered. This court has previously held that “[a] liquidated damages clause is prima facie valid unless the challenging party proves its application amounts to an unenforceable penalty.” Joseph F. Sanson Investment v. 286 Limited, 106 Nev. 429, 435, 795 P.2d 493, 497 (1990) (citing Haromy v. Sawyer, 98 Nev. 544, 546-47, 654 P.2d 1022, 1023 (1982); Silver Dollar Club v. Cosgrilf Neon, 80 Nev. 108, 389 P.2d 923 (1964)). Further, “[i]n order to prove that a liquidated damages clause constitutes a penalty, the challenging party must persuade the court that the liquidated damages are disproportionate to the actual damages sustained by the injured party.”
 
 [3]
 

 Id.,
 
 795 P.2d at 497 (quoting
 
 Haromy ,
 
 98 Nev. at 547, 654 P.2d at 1023 (citation omitted)). Thus, Republic has the burden of persuasion on this point.
 
 Id.,
 
 795 P.2d at 497.
 

 In
 
 Silver Dollar Club,
 
 this court affirmed the district court’s finding that a liquidated damages clause in a lease/sale agreement was not a penalty, stating: “If appellant [the party challenging the provision] had introduced evidence showing that the actual damages were considerably smaller than the amount stipulated, this could be regarded as an indication that the amount named was intended as a penalty, but no such evidence was introduced.” 80 Nev. at 112, 389 P.2d at 925.
 

 In the instant case, neither party attempted to reconcile the $18,500.00 award with the evidence presented at trial. Although the Loomises vehemently contend that they have been damaged by Republic’s breach of the purchase agreement, both sides admit that there was no
 
 evidence
 
 of actual damages. Thus, Republic has not borne its burden of showing that the amount of actual damages is disproportionate to the amount of damages recovered under the liquidated damages clause. The Loomises are therefore entitled to recover $275,000.00 in liquidated damages as provided for in the purchase agreement.
 

 
 *1127
 

 LFC’s Right to Receive a Broker’s Fee
 

 As stated, LFC and its agents have been found guilty of breaching their fiduciary relationship with the Loomises. Nevertheless, in spite of the mentioned perfidy, LFC successfully obtained judgment against the Loomises for a real estate brokers’ fee arising out of the sale of the subject property to Allright. Rather than discuss the relationship of real estate brokers’ breach of fiduciary relationship to their entitlement to a fee from the persons with whom they have broken faith, we limit our discussion to LFC’s violations of Nevada’s real estate brokers’ licensing laws.
 

 The Loomises assert that LFC is barred from bringing an action for a commission on the sale of the triangle piece to Allright because of LFC’s willful evasion of Nevada’s real-estate licensing scheme (NRS Chapter 645, hereinafter “the Act”). We agree.
 

 The legislature has enacted a comprehensive regulatory scheme (“the Act”) for the purpose of protecting the public in their dealings with persons in the real estate profession. Whiddett v. Mack, 50 Nev. 289, 295-96, 258 P. 233, 233-34 (1927). “The purpose of the Act is to restrict the vocation of acting as a real estate broker or real estate salesman to persons bearing a good reputation for honesty, truthfulness, fair dealing, and competency.”
 
 Id.
 
 at 295, 258 P. at 234 (citations omitted);
 
 see
 
 NRS 645.330. The Act makes it unlawful for anyone to act as a broker or salesman without a Nevada real estate license. NRS 645.230(1).
 
 [4]
 

 In addition, NRS 645.030 describes what kinds of activities constitute acting in the capacity of a broker or salesman. NRS 645.030 provides that a broker or salesman is any person, including a corporation, “who, for another and for compensation or with the intention or expectation of receiving compensation; [] Sells, exchanges, options, purchases, rents, or leases, or negotiates or offers, attempts or agrees to negotiate the sale, exchange, option, purchase, rental, or lease of . . . any business or real estate.” NRS 645.030(1)(a).
 

 Even a single act that falls within the description of the activities of a real estate broker described in NRS 645.030 constitutes action in the capacity of a broker or salesman. NRS 645.260.
 

 In the present case, both Lange, who negotiated LFC’s listing agreement with the Loomises, and Valentine, who met repeatedly
 
 *1128
 
 with the Loomises and potential buyers and who, LFC now argues, was the procuring cause of the sale to Allright, undisput-edly committed acts falling within the description of broker or salesman. Neither had applied for, nor been issued, a Nevada real estate license. LFC contends that individual licensure was unnecessary because Lange’s and Valentine’s actions fell within the sphere of permissibility provided by LFC’s corporate license. This contention lacks merit.
 

 The Act requires that any partnership or corporation doing business as a real estate broker must designate one of its members to apply for the broker’s license to be issued to the corporation or partnership. NRS 645.370(1). Additionally, each member or officer of a corporation or partnership who is going to perform or engage in any of the acts specified in NRS 645.030 “shall . . . take out a
 
 separate broker’s license
 
 in his [or her] own name individually.” NRS 645.380 (emphasis added). Clearly any requirement of corporate licensure is in addition to, rather than in place of, the requirements of individual licensure.
 

 LFC also contends that, even if Lange and Valentine are required to have been licensed, LFC, its breach of fiduciary duties aside, has substantially complied with the licensing requirements and that LFC should be allowed to maintain an action in equity for its commission.
 

 Nevada follows the general rule that “contracts made in contravention of the law do not create a right of action.” Vincent v. Santa Cruz, 98 Nev. 338, 241, 647 P.2d 379, 381 (1982). As one. court aptly stated: “[N]o court should be required to serve as paymaster of the wages of crime.” Stone v. Freeman, 82 N.E.2d 571, 572 (N.Y. 1948). This rule, however, is not absolute; in fact, this court has recognized a narrow exception to it. For example, in Magill v. Lewis, 74 Nev. 381, 386, 333 P.2d 717, 720 (1958), this court allowed an unlicensed building contractor to try its case on a theory of fraud and unjust enrichment because “no serious moral turpitude [was] involved” and because “the defendant [was] the one guilty of the greatest moral fault.” Similarly, in Nev. Equities v. Willard Pease Drilling, 84 Nev. 300, 303, 440 P.2d 122, 123 (1968), this court held that a contractor licensed by Nevada to drill for oil and gas was not barred from bringing suit merely because it lacked a specialty license to drill for hot mineral water. This court reasoned that the drilling company had “substantially complied with the licensing scheme,” specifically noting that there was no suggestion that the drilling company “was wanting in experience, financial responsibility, or indeed, in any particular detrimental to the safety and protection of the public.”
 
 Id.,
 
 440 P.2d at 123.
 

 
 *1129
 
 We do not find the narrow exception carved out in
 
 Magill
 
 and
 
 Nev. Equities
 
 to be apposite to the facts of the present case. LFC is an experienced and sophisticated corporate broker whose actions in contravention of Nevada real estate law were blatant, substantial, and repeated. Equity will not relieve LFC of its clear obligations to comply with Nevada’s real estate regulatory scheme, especially in light of LFC’s having violated its fiduciary duties to its principal. We, therefore, conclude that LFC is barred from recovering a commission from the Loomises.
 

 The judgment awarding the Loomises $18,500.00 in damages for the breach of contract by Republic is reversed. The judgment awarding LFC a commission of $95,000.00 under its contract with the Loomises and its accompanying award of attorneys’ fees and costs is reversed. The judgment in favor of the Loomises for breach of implied covenant of good faith and fair dealing is reversed.
 
 [5]
 
 We, therefore, remand this matter to the district court with instructions that it enter judgment against Republic and in favor of the Loomises in the amount of $275,000.00, the amount required by the parties’ contract as liquidated damages. In light of this disposition, the judgment for attorney’s fees in favor of respondent LFC is reversed.
 

 [1]
 

 Although signed by Lange, the agreement did not otherwise bear his name.
 

 [2]
 

 Allright had previously made an offer to purchase the triangle piece from the Loomises in April 1990, but they had rejected the offer. The marketing agreement entered into between LFC and the Loomises contained a provision whereby LFC would be paid a commission for a period of one year following the expiration of the marketing agreement if the Loomises sold the property to a “prospective purchaser” listed by LFC prior to the expiration of the original listing period. LFC did provide such a list of prospective purchasers, and Allright was on that list.
 

 [3]
 

 Nevada’s willingness to take into account post-formational events in determining the validity of contractual provisions stipulating damages in advance seems to be in line with the modern trend.
 
 See
 
 Roger A. Cunningham, et al.,
 
 The Law of Property
 
 679 (1993).
 

 [4]
 

 NRS 645.230(1) states: “It is unlawful for any person, partnership, association or corporation to engage in the business of ... a real estate broker . . . within the State of Nevada without first obtaining the appropriate license from the real estate division . . . .”
 

 [5]
 

 The Loomises recover damages for breach of contract. This is not an appropriate case in which to pursue an action for breach of implied covenant of good faith and fair dealing.
 
 See generally
 
 Hilton Hotels v. Butch Lewis Productions, 197 Nev. 226, 808 P.2d 919 (1991).