52 F.3d 333
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 Michael KENT and John Kent, Plaintiffs-Appellants,
v.
Ivan MINDLIN, Defendant-Appellee.
 No. 93-17286.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted April 13, 1995.
Decided April 21, 1995.
 
 IN PART, VACATED AND REMANDED IN PART.
 Before: GIBSON,* GOODWIN and HUG, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Plaintiffs Michael and John Kent agreed with Ivan Mindlin to pool their resources (skill and money) and place bets on sports events. After several profitable years, the Kents thought Mindlin was wrongfully withholding their share of wagering profits and brought this diversity action. The district court dismissed the action after taking enough testimony to decide that the action was basically a suit to enforce the terms of an illegal agreement. The Kents appeal. We affirm in part and vacate and remand in part.
 
 I.
 
 3
 From 1981 until 1986, the Kents, Mindlin, and others were parties to a sports betting pool which placed bets at licensed sports books in Nevada, as well as with unlicensed bookies in states where sports betting is illegal.
 
 
 4
 In 1987, the Kents and Mindlin allegedly agreed that all bets would be placed with licensed Nevada bookmakers. The Kents claim that all bets placed in 1987 were therefore legal, and that they are owed approximately $200,000. The Kents also allege an additional 1987 sports betting agreement. Pursuant to this agreement, Michael Kent was to furnish Mindlin with odds for the college football season in exchange for a $700,000 fee. Mindlin was then free to lay bets on the games at licensed Nevada sports books and keep any gambling profits for himself. The agreement lasted one week, for which Michael Kent claims he is owed $35,650.
 
 A. The 1984-1985 Agreement
 
 5
 In 1984 and 1985, the Kents knew that the pool was placing substantial bets with unlicensed bookmakers in states other than Nevada. Indeed, on one occasion Michael Kent himself travelled to New York City to pick up $100,000 that had been won on bets placed with New York bookmakers. Michael Kent explained that the pool placed bets with unlicensed bookmakers in addition to licensed Nevada sports books because unlicensed bookmakers would accept larger bets,[1] and because bets placed with unlicensed bookmakers would not affect the "line" at the licensed Nevada sports books. Licensed sports books adjust their "lines" in response to wagering patterns. By placing bets with unlicensed bookmakers first, and with licensed Nevada sports books last, the pool could secure more favorable "lines," and, obviously, increase the pool's probability of success.
 
 
 6
 These facts have never been disputed. The dispute has been over which state's law should be applied to the enforceability of the 1984-1985 pool agreement.
 
 1.
 
 7
 In contract cases, Nevada courts appear to follow the Restatement (Second) of Conflict of Laws (1971). See Laxalt v. McClatchy, 116 F.R.D. 438, 448-49 (D.Nev.1987). Applying Section 202 of the Restatement, the district court first looked to the laws of New York and Florida, two of many states where the pool placed bets with unlicensed bookmakers. Because sports gambling is illegal in those states, the district court concluded that the pool acted illegally. Applying Section 188 of the Restatement, the district court next applied Nevada law to determine whether the illegality of the pool's conduct affected the enforceability of the parties' agreement to share profits from the wagers. Because under Nevada law "contracts made in contravention of the law do not create a right of action," Vincent v. Santa Cruz, 98 Nev. 338, 381 (1982), the district court ruled that Nevada courts would not enforce the pool agreement.
 
 
 8
 Although the district court's choice of law analysis seems to be a straightforward application of Sections 202 and 188, and finds support in Florida Risk Planning Consultants, Inc. v. Transport Life Insurance Company, 732 F.2d 593, 595-96 (7th Cir.1984) and Don King Productions, Inc. v. Douglas, 742 F.Supp. 741, 753 n. 13 (S.D. NY 1990), the Kents argue that Nevada courts would approach the choice of law issue differently. They argue that because licensed sports-betting exists in Nevada, the courts of that state would apply Nevada law to determine the legality of the pool agreement; and would hold that it was legal. It is not necessary to spell out the details of the Kents' approach to the choice of law issue, because their premise--that under Nevada law the pool is legal--is wrong. In the end, it does not matter which state's law is used to analyze the legality of the pool: it is illegal in every state in the union, including Nevada.
 
 2.
 
 9
 Nevada courts do enforce betting pool agreements to lay wagers at licensed casinos and share the profits. In Siegel v. McEvoy, 101 Nev. 623 (1985), the plaintiff agreed to pay the defendant's costs in entering a poker series sponsored by Las Vegas' Horseshoe Club, and the defendant agreed to pay the plaintiff twenty percent of any winnings he might receive. The defendant won a substantial sum, but refused to pay the plaintiff his twenty percent share. When the plaintiff sued for breach of contract, the defendant argued that the suit was premised on an unenforceable gaming debt. The Nevada Supreme Court held that the contract was not an unenforceable gambling contract, but a legally enforceable business arrangement:
 
 
 10
 [Plaintiff] allegedly provided [defendant] with funds to cover [defendant's] costs in entering a lawful poker tournament sponsored by a duly licensed Las Vegas casino in which [plaintiff] did not participate. If his evidence prevails, their agreement was to divide between themselves the profits made in the tournament, and was not a situation in which one player was to lose to the other.
 
 
 11
 Id. at 626 (emphasis added).
 
 
 12
 We add emphasis to the quoted passage to underscore the obvious. Had the parties' 1984-1985 pool agreement been limited to placing bets at licensed sports books, it would have been enforceable under Siegel. But the agreement was not so limited. The agreement was, in part, to place bets with unlicensed bookmakers, and unlicensed bookmaking is a crime in Nevada. See NRS 463.160.
 
 
 13
 Unlicensed gambling is obviously deleterious to Nevada's economy, because it goes untaxed. See Sacco v. State, 105 Nev. 844, 847 (1989) ("[B]ecause licensed gambling is indispensable to Nevada's economy, we believe that the legislature proscribed unlicensed gaming because it represents a serious threat to the state's economic base.") It is also deleterious to Nevada's public welfare, because it tends to attract crime. See United States v. Polizzi, 500 F.2d 856, 871 (9th Cir.1974), cert. denied, 419 U.S. 1120 (1975). Over forty years ago the Nevada Supreme Court wrote:
 
 
 14
 We note that while gambling, duly licensed, is a lawful enterprise in Nevada, it is unlawful elsewhere in this country; that unlawfully followed elsewhere it tends there to create as well as to attract a criminal element; that it is a pursuit which, unlawfully followed, is conducive of corruption; that the criminal and corruptive elements engaged in unlawful gambling tend to organize and thus obtain widespread power and control over corruptive criminal enterprises throughout this country; that the existence of organized crime has long been recognized and has become a serious concern of the Federal government as well as the governments of the several states.
 
 
 15
 ... The risks to which the public is subjected by the legalizing of this otherwise unlawful activity are met solely by the manner in which licensing and control are carried out.
 
 
 16
 Nevada Tax Commission v. Hicks, 73 Nev. 115, 119-20 (1957) (emphasis added). That the pool's unlicensed gambling occurred out of state does not change matters. Nevada's economy suffers just as much when gamblers place bets with unlicensed bookmakers out of state as it does when gamblers place bets with unlicensed bookmakers in state. It is the public policy of Nevada to refuse to allow its courts " 'to serve as paymaster of the wages of crime,' " Loomis v. Lange Financial Corporation, 109 Nev. 1121, 1165 (1993), quoting Stone v. Freeman, 298 N.Y. 268 (1948). The trial court correctly held that it was against the public policy of Nevada to enforce the parties' 1984-1985 pool agreement.[2]
 
 B. The 1987 Agreement
 
 17
 The Kents offered evidence that, in 1987, the parties concluded their earlier pool agreement and struck a new one. According to the Kents, in response to the "heat" of a federal investigation of the pool, the parties expressly agreed that their 1987 bets would be placed exclusively with licensed sports books in Nevada. The Kents also allege that Michael Kent reached an additional agreement with Mindlin, pursuant to which Michael Kent would provide Mindlin with odds on college football games in exchange for a $700,000 fee.
 
 
 18
 Both Michael Kent and Mindlin testified in depositions that, in 1987, bets were placed only in licensed Nevada sports books. At an evidentiary hearing, the Kents tried to present additional evidence to that effect, but were cut short when Mindlin's counsel notified the district court that he was unprepared to address the 1987 agreements.
 
 
 19
 At a later proceeding however, Mindlin's counsel brushed aside the parties' factual dispute. Applying the law of criminal conspiracy by analogy, Mindlin's counsel argued that because the 1987 agreements and the previous agreement were agreements to handicap and wager on sporting events, the 1987 agreements could not be considered distinct or untainted by the previous years' illegality. In its grant of summary judgment, the district court apparently agreed with this argument.
 
 
 20
 No valid reason appears in this record why the 1987 agreement, if proved at trial to have been a legal contract, could not be severed from its antecedents and enforced according to whatever terms the parties can prove.
 
 
 21
 The Kents say they will testify that, in 1987, "the Kents performed data collection and updating activities; that Mindlin performed wagering activities; that the parties agreed that all of the wagers were to be placed at licensed casinos in Nevada," and so forth. Under Siegel, that evidence could support the Kents' claims for sums accrued in 1987.
 
 II.
 
 22
 We hold that the illegal agreement in effect between the parties prior to 1987 was unenforceable, and the court correctly left the parties where it found them. However, we vacate the summary judgment, and remand for trial to allow the Kents to present evidence pertaining to the 1987 wagering agreements. Each party shall bear its own costs.
 
 AFFIRMED IN PART, VACATED AND REMANDED IN PART
 
 
 *
 The Honorable Floyd R. Gibson, Senior United States Circuit Judge for the 8th Circuit, is sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Kent testified that Mindlin told him "you could bet more money with bookmakers in one square mile of Manhattan than you could in the entire state of Nevada."
 
 
 [2]
 There are exceptions to the Nevada rule against enforcing illegal contracts, but none that apply here
 First there is the doctrine of severability. "[W]here a contract consists of several agreements, one of which is illegal, the illegal portion can be severed if it does not destroy the symmetry of the contract." Vincent, 98 Nev. at 381. But the 1984-1985 pool agreement was an integrated scheme to maximize the favorable lines through the placing of bets with unlicensed bookmakers. The illegality was so interwoven into that scheme that it affects the entire agreement. See E. Allen Farnsworth, Contracts, Sec. 5.8, at 383 (2d ed. 1990).
 Second, there is the doctrine that a less culpable plaintiff will not be barred from recovering from a more culpable defendant. However, the uncontested facts make it utterly plain that the Kents were in pari delicto with Mindlin.