106 F.3d 407
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Michael KENT; John Kent, Plaintiffs-Appellees,
v.
Ivan MINDLIN, Defendant-Appellant.
 No. 96-15338, 96-15468.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 9, 1996.
Decided Jan. 15, 1997.
 
 Before: WIGGINS, BRUNETTI, T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 OVERVIEW
 
 2
 John and Michael Kent sued Dr. Ivan Mindlin in district court for the breach of two agreements related to sports betting pools. Mindlin denied the existence of the agreements and also argued they were illegal in any event. After a bench trial, the district court rendered judgment for the Kents, and Mindlin appealed. This court has jurisdiction under 28 U.S.C. § 1291. We AFFIRM the judgment.
 
 
 3
 In this lawsuit, the Kents initially claimed Mindlin owed money for betting pools in 1984-85 and for two other sports betting agreements in 1987. Mindlin defended both claims by denying the existence of the 1987 agreements and by arguing that all the agreements were unenforceable because they involved gambling that was illegal under state law.
 
 
 4
 The district court granted summary judgment in favor of Mindlin, finding all the alleged agreements were unenforceable because the subject matter involved illegal betting (at unlicensed bookmakers in various states). On appeal, we affirmed with regard to the claims arising from 1984-85. Kent v. Mindlin, 52 F.3d 333 (TABLE), 1995 WL 236248 (9th Cir.1995). We remanded to the district court, however, for further proceedings to determine the legality and enforceability of the two alleged 1987 contracts.
 
 
 5
 After a bench trial, the district court rendered judgment in favor of the Kents. It ruled that the parties had entered into two legal betting arrangements involving the 1987 college football season. First, Mindlin agreed to pay $700,000 to the Kents in exchange for an exclusive right to bet the sport lines based on the computer analysis the Kents generated (the "Information Agreement"). After one week, Mindlin terminated the agreement, to which the Kents agreed without giving up their right to payment for their analysis of the games they had provided for the one week. That week (one of sixteen for the season), only 22 games had been posted for bets. Because 430 games were expected to be posted for the season, the Kents claimed 22/430 of the $700,000. The court thus awarded $35,648.
 
 
 6
 Soon after the Information Agreement ended, Mindlin, the Kents, and others agreed to another betting arrangement (the "Betting Agreement"). The Betting Agreement formed a betting pool based on the Kents generating the betting analysis and Mindlin placing bets at the Union Plaza casino (a legal sports book) in Las Vegas on the Sundays before the games. Mindlin's primary contribution to the pool was his access to a non-public early line through his relationship with the managers.
 
 
 7
 The Kents testified that they believed Mindlin placed the bets personally at the Union Plaza, rather than phoning them in from out-of-state. The Kents also testified that they intended that this pool's bets would only be placed in legal sports books. Occasionally, other participants in the plan would place bets later in the week at other licensed sports books if the betting lines changed favorably.
 
 
 8
 Each week, John Kent would calculate how much Mindlin owed the rest of the pool from the Union Plaza bets and subtract Mindlin's share of the profits from the other bets. Until it ceased operations around October 31, 1987, the pool had a positive running balance from the Union Plaza operations of $166,900. The Kents were entitled to 80% of the profits from what Mindlin owed to the rest of the pool. Mindlin paid the other participants their share, but did not pay the Kents. Thus, the district court found that Mindlin owed the Kents $133,520 under the Betting Agreement.
 
 
 9
 Thus, the total judgment for the Kents was $169,168, plus prejudgment interest. The order stated interest on the Information Agreement should accrue from September 5, 1987, and on the Betting Agreement from October 31, 1987.
 
 Discussion
 
 10
 We review the district court's findings of fact for clear error. Fed.R.Civ.P. 52(a); Masayesva v. Zah, 65 F.3d 1445, 1453 (9th Cir.1995), cert. denied sub. nom., 116 S.Ct. 1569 (1996). Questions of law, including a district court's interpretation of state law, are reviewed de novo. Salve Regina College v. Russell, 499 U.S. 225, 231, 111 S.Ct. 1217, 1221 (1991). Applications of law to facts present mixed questions, reviewed de novo where the application requires "consideration of legal principles." Masayesva, 65 F.3d at 1453. We review for clear error, however, if the application is "essentially factual." Id.
 
 
 11
 Mindlin alleges several specific errors, both to the sufficiency of the district court's findings and to its substantive decision. He contends that the Information Agreement and the Betting Agreement were illegal, and that the district court did not make sufficient findings of their legality in any event. Mindlin also challenges several of the district court's factual determinations, claiming that the district court (1) had no factual basis to find the parties agreed to the terms of the Information Agreement, (2) erred in not finding the Betting Agreement illegal because Mindlin placed illegal telephone wagers from out-of-state to make the agreement work, and (3) improperly awarded prejudgment interest.
 
 A. Legality of the Contracts
 
 12
 The Kents argue that Mindlin's objections to the alleged illegality of the agreements under Nevada Revised Statutes § 463.361 and § 463.160(1)(b) are waived because Mindlin did not raise them to the district court. We agree that Mindlin failed to raise the argument that an "information service" license was required for the Information Agreement to be legal under § 463.160(b).[1] While the parties extensively argued and briefed the legality of the contracts in general, the district court had no notice that it should specifically address the "information service" license defense under § 463.160(1)(b). Accordingly, we decline to consider this new argument on appeal.
 
 
 13
 Mindlin did sufficiently raise the "gaming debt" argument. His Proposed Findings of Fact and Rules of Law included a specific reference to § 463.361. Thus, we consider this argument on appeal. For the reasons explained below, however, we reject it.
 
 
 14
 Mindlin contends that the Betting Agreement is an unenforceable "gaming debt." Under N.R.S. § 463.361, a "gaming debt" is not enforceable without a "credit instrument," that is, a writing that evidences a gaming debt owed to one who holds a gaming license. N.R.S. § 463.01467. Mindlin argues that "gaming debt" is undefined by Nevada statute, but that sports betting is clearly a "game" under N.R.S. § 463.0152. Thus, any obligation under the Betting Agreement would be unenforceable because the Betting Agreement is an oral agreement.
 
 
 15
 Mindlin's argument is incorrect. The Betting Agreement did not create a "gaming debt" under N.R.S. § 463.361 because it did not involve the parties wagering against each other. Although "gaming debt" may be undefined by statute, the Nevada Supreme Court distinguished betting pools, including oral ones, from "gaming debts." Sigel v. McEvoy, 707 P.2d 1145, 1146 (Nev.1985) (enforcing pool agreement as not violative of common law prohibition on enforcement of gaming debts). The Nevada Supreme Court recognized that § 463.361 somewhat modified the common law rule on the enforceability of gaming debts, id., but the statute did not change (or even mention) the meaning of the term "gaming debt." See generally Moser v. State, 544 P.2d 424, 426 (Nev.1975) (in deciding a criminal case, stating that Nevada follows the "canon of statutory construction which provides that words in a statute are presumed to be used in their common law sense, unless it clearly appears that another meaning was intended."). Sigel recognized the essence of a "gaming debt" is that "one player was to lose to the other." Sigel, 707 P.2d at 1146. Thus, "gaming debts" differ from agreements to divide profits between the parties resulting from wagers with third parties (such as sports books).
 
 
 16
 Moreover, as we stated on the previous appeal, "Nevada courts do enforce betting pool agreements to lay wagers at licensed casinos and share profits." Kent v. Mindlin, 52 F.3d 333 (TABLE), 1995 WL 236248 at * 2 (9th Cir.1995) (citing Sigel). We also said that evidence that the Kents collected and analyzed data, that Mindlin would place the wagers, that all wagers would be at licensed casinos, and so forth, could support a finding the 1987 agreements were lawful under Sigel. Id. at * 4.
 
 B. Sufficiency of the Findings
 
 17
 Mindlin contends that the district court failed to specify adequately why the 1987 agreements were legal under Nevada law in its Findings of Fact and Conclusions of Law ("findings"). Federal Rule of Civil Procedure 52(a) states
 
 
 18
 In all actions tried upon the facts without a jury ..., the court shall find facts specially and state separately its conclusions of law thereon....
 
 
 19
 The findings, stated either in the court's opinion or separately, must be sufficient to indicate the factual basis of the ultimate conclusion. Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422, 63 S.Ct. 1141, 1145 (1943); Vance v. American Hawaii Cruises, Inc., 789 F.2d 790, 792 (9th Cir.1986). Neither detailed evidentiary findings nor findings asserting the negative of every issue is required, however. Carr v. Yokohama Specie Bank, Ltd., 200 F.2d 251, 255 (9th Cir.1952).
 
 
 20
 The district court made sufficient findings regarding the legality of the agreements. The district court provided six pages of findings. The court cited Sigel for its conclusion the agreements were legal. The district court was not required to specifically reject every argument made by Mindlin. By citing Sigel, the most relevant Nevada case, it provided sufficient basis to understand its legal conclusions. The district court also clearly set forth the underlying facts of the argreements. It found that no illegal out-of-state bets were placed under the agreements. It noted Mindlin's arguments lacked evidentiary support. Thus, we find the district court made adequate findings.
 
 C. Factual Determinations at Trial
 
 21
 Mindlin alleges the district court clearly erred in finding that the parties agreed to the terms of the Information Agreement and that the two agreements were actually performed legally. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even [if] convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). Because the district court's conclusions are supported by the record, we find no clear error.
 
 
 22
 1. Mindlin's Agreement to the Terms of the Betting Agreement.
 
 
 23
 Mindlin contends that he did not agree to sufficient terms to enforce the Information Agreement for the one week of betting it was in effect. First, he contends that Kent's testimony is self-serving and incredible. He argues that it was unlikely a "sophisticated gambler such as Mindlin" would agree to pay $700,000 for information, noting gambling was uncertain and that the information generated lower revenues than originally predicted.
 
 
 24
 This challenge to the Information Agreement is meritless. As the district court noted, "Mindlin offered no evidence that the agreement did not exist as described by the Kents in their testimony." Mindlin's failure to testify to contradict the Kents deprived the district court with potentially the most persuasive reason to disbelieve the Kents' description of the Information Agreement. See Baxter v. Palmigiano, 425 U.S. 308, 318 (1976) (noting failure to testify in civil case justifies inferences against party). Instead, Mindlin offered only argument that the court ought not believe the Kents. Thus, it was not clear error for the district court to believe the Kents or to determine that Mindlin entered into the Information Agreement.
 
 
 25
 Mindlin's next challenge is that the parties had no meeting of the minds to enforce any obligation under the Information Agreement for the one week before they terminated it. He cites Michael Kent's testimony that the pro rata calculation was not agreed upon originally and that it was done arbitrarily.
 
 
 26
 The Information Agreement can be broken down under the doctrine of agreed equivalents to enforce it for the one week it was in effect. The doctrine allows apportionment of performance into corresponding pairs of obligations that can be readily calculated. According to the Restatement of Contracts, if one party performs part of his obligation, that triggers the corresponding partial obligation of the other party. Restatement (Second) of Contracts § 240. While Nevada has not addressed Restatement (2d) § 240 specifically, it often relies on the Restatement when analyzing contract questions. E.g. Oh v. Wilson, 910 P.2d 276, 278-79 (Nev.1996); General Motors v. Jackson, 900 P.2d 345, 348 (Nev.1995). Other jurisdictions have adopted Restatement (2d) § 240. Potter & McArthur, Inc. v. City of Boston, 446 N.E.2d 718, 719 (Mass.Ct.App.1983). Thus, we conclude that the doctrine should apply in this case, under Nevada law.
 
 
 27
 The Kents provided Mindlin exclusive use of their handicapping analysis for one week. Mindlin then asked to terminate the Information Agreement. Michael Kent agreed, but reserved the Kents' right to payment for the one week. Thus, the Kents' partial performance triggered a corresponding obligation of Mindlin to pay for the one week's handicapping analysis he used. The Kents claimed a percentage of the $700,000 based on the percentage of the season's games that occurred during the week that the agreement was valid. Thus, the Kents claimed 22/430 of the total fee.
 
 
 28
 Moreover, Mindlin has no valid complaint that the apportionment of a part of the Kents' $700,000 fee was unfair. The other obvious apportionment would be to split the fee equally for each of the sixteen weeks in the season. This would have yielded a debt of over $43,000. For Mindlin to complain of the $35,648 apportionment amounts to little more than a complaint that he did not agree to any amount. He is not entitled, however, to take partial service, to pay no part of the fee, and then to cancel the agreement with no liability.
 
 
 29
 2. The Legality of the Wagers Pursuant to the Betting Agreement.
 
 
 30
 Mindlin also challenges the district court's finding that he placed only legal bets in Nevada casinos under the Betting Agreement. Mindlin argues that he lived in California during the 1987 football season, and that he could not have placed bets at the Union Plaza as alleged by the Kents. Thus, the Betting Agreement must have involved illegal out-of-state bets, and hence it must be unenforceable. For this argument, Mindlin relies on the log of his secretary, Ms. Rainey, to establish that he was not in Las Vegas for many of the weekends when he allegedly placed legal bets at the Union Plaza. He also cites Frank Larrieu's testimony that Mindlin bet with illegal bookmakers during the 1987 football season.
 
 
 31
 The record provides ample support for the district court's conclusion. Michael Kent testified he often spoke with Mindlin on Sundays by calling Caesar's Palace (in Las Vegas), where Mindlin allegedly stayed. Kent also testified he saw Mindlin on several of the relevant weekends. The record reveals evidence that the secretarial log may be suspect because (1) the secretary generally did not actually talk to Mindlin on weekends; (2) she did not discuss his gambling with him or have personal knowledge beyond what was in the newspapers; and (3) her log of his travels "conveniently" started just before the events subject to the lawsuit. Further, Larrieu hedged on cross-examination about how much he actually knew about Mindlin's actions.
 
 
 32
 Finally, Michael Kent testified that Mindlin admitted he owed the pool $166,900 under the Betting Agreement. This testimony was uncontradicted. Based on all of the trial evidence, the district court did not clearly err in finding by the preponderance of the evidence that Mindlin placed bets at Union Plaza as described by the Kents.
 
 D. Prejudgment Interest
 
 33
 Mindlin contends that the district court erred in its award of prejudgment interest for breach of the agreements. He contends the interest award is impermissible because the district court allegedly failed to explain how it determined the dates from which the interest was due. Whether an award of prejudgment interest is permitted as a matter of law is reviewed de novo. Hopi Tribe v. Navajo Tribe, 46 F.3d 908, 921 (9th Cir.), cert. denied, 116 S.Ct. 337 (1995). See also O'Neill v. United States, 50 F.3d 677, 682 (9th Cir.1995) (reviewing de novo principles of contract law applied to the facts).
 
 
 34
 Under Nevada law, plaintiffs are entitled to interest from the date the money became due to them from the defendant. N.R.S. § 99.040. Mindlin argues that the district court impermissibly provided its own date without having trial evidence to show the parties agreed as to when the alleged amounts were to be paid. He relies on Brandon v. Travitsky, 472 P.2d 353, 355 (Nev.1970) (reversing where trial court chose a beginning date based on "fairness and equity," and instead beginning interest award from date the evidence showed the performance of the various obligations was due).
 
 
 35
 We do not find error in the district court's award. The time that Mindlin's performance was due under each agreement was reasonably clear. Performance is due from the time a contract is breached. Paradise Homes, Inc. v. Central Sur. & Ins. Corp., 437 P.2d 78, 83 (Nev.1968). At trial, the evidence showed that on October 31, 1987, Mindlin admitted he owed money on the Betting Agreement when the parties terminated it. Further, the Kents agreed to stop the Information Agreement after the September 5th games, though they did not waive a partial payment based on those games. Thus, the district court awarded interest from the termination of each agreement--September 5, 1987[2] for the Information Agreement and October 31, 1987 for the Betting Agreement. This is consistent with the trial evidence, Brandon, and Paradise Homes.
 
 CONCLUSION
 
 36
 For the foregoing reasons, we AFFIRM the judgment.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Mindlin admits that § 463.160(b) was only specifically raised before the previous appeal (and thus was not raised to Judge Pro before or during the bench trial on the 1987 agreements). Further, the statute was not raised, for example, in Defendant's Trial Brief, the Joint Pretrial Order or Defendant's Requests for Findings of Fact and Rules of Law
 
 
 [2]
 The Kents concede that the parties actually terminated the agreement on September 6, 1987. The one-day discrepancy is de minimis