OPINION
 

 Per Curiam:
 

 SUMMARY
 

 This case presents us with two issues: (1) whether a writ of attachment may be used to secure property after a judgment has already been obtained; and (2) whether a judgment creditor can pierce the corporate veil using a reverse alter ego analysis to reach the assets of a corporation that is allegedly controlled by the judgment debtor. Since 1996, Cebe, Andrew, Christian and Just Loomis (the “Loomises”) have been trying to recover a $25,000.00 judgment from William Lange (“William”) concerning a failed real estate transaction with William’s brokerage firm Lange Financial Corporation (“LFC”). Unable to satisfy their judgment, the Loomises obtained a writ of attachment on commissions payable to LFC Marketing Group, Inc. (“LFC Marketing”) held in escrow by a Nevada title company. LFC Marketing, whose sole shareholder is William’s brother Robert Lange (“Robert”), disputed that William was entitled to any of the commissions and requested a hearing on the writ to settle title to the deposited monies. The district court determined that LFC Marketing was the alter ego of William, and thus ordered that the Loomises’ judgment be satisfied out of the attached commissions.
 

 We first conclude that the procedure employed by the Loomises—using a writ of attachment to aid in post-judgment recovery—is allowable under our statutes. Further, we conclude that in certain limited circumstances, the alter ego doctrine may be applied to recover an individual debt from the assets of a corporation determined to be the alter ego of the individual debtor.
 
 *899
 
 Finally, we conclude that there was substantial evidence in this case to support the district court’s finding.
 

 STATEMENT OF FACTS
 

 The underlying facts of the transaction that ultimately resulted in a judgment in favor of the Loomises against William are recited in Loomis v. Lange Financial Corp., 109 Nev. 1121, 865 P.2d 1161 (1993). The relevant judgment in that case was the district court order requiring William to pay the Loomises $25,000.00 in attorney fees.
 

 This case involves the Loomises’ attempts to collect the judgment owed by William, a California resident and sole shareholder of LFC, who currently does not have a Nevada real estate license.
 

 LFC, a California brokerage firm with whom the Loomises contracted to market and sell property owned by the Loomises in downtown Reno, is associated with a consortium of smaller companies, collectively known as the LFC Real Estate Network. Included in this network is LFC Marketing, a Nevada corporation performing real estate brokering services whose sole shareholder and president is William’s brother Robert. A month after LFC Marketing’s incorporation, William was elected vice president “for the purpose of conducting related activities,” but was not authorized to conduct any activity on behalf of LFC Marketing that required a real estate license. Also included in the network is LFC Communications Limited (“LFC Communications”), a California entity performing advertising services whose sole shareholder is William’s wife and whose president is William.
 

 Importantly, the Nevada Land and Resources Company (“NLRC”) hired LFC Marketing and LFC Communications to assist in selling its substantial Nevada real estate holdings. As a result of services provided by LFC Marketing, NLRC deposited funds in excess of $25,000.00 with a local Nevada title company to be paid to LFC Marketing. Having learned of the NLRC deposit, the Loomises filed an ex parte motion for a writ of attachment
 
 [1]
 
 on August 4, 1997, which requested the seizure of the deposited monies in the amount of $25,000.00 plus interest to satisfy William’s judgment debt.
 

 Believing that the attached funds did not belong to William in any way, LFC Marketing filed a third-party claim asserting sole ownership of the attached funds. Pursuant to NRS 31.070(5),
 
 [2]
 
 a
 
 *900
 
 hearing was scheduled and held to settle the ownership of the property.
 

 At the hearing, which was not attended by William, the Loomises argued that LFC Marketing was the alter ego of William, and thus sought to pierce the corporate veil in reverse to reach the deposited funds. In support of their contention, the Loomises presented the following: (1) Robert’s testimony that William wrote ninety percent of LFC Marketing’s correspondence to NLRC; (2) evidence that William negotiated and signed early drafts of the marketing agreement between LFC Marketing and NLRC; (3) testimony from one of LFC Marketing’s brokers that William drafted the final marketing agreement but asked that the broker sign the final version on LFC Marketing’s behalf; (4) evidence that William hired and supervised LFC Marketing’s brokers; (5) testimony from NLRC’s accountant that he dealt exclusively with William and believed William to be the ultimate authority for all of LFC Marketing’s dealings; (6) documentation indicating that William was holding himself out to be the “president and CEO” and the “primary owner” of LFC Marketing; (7) evidence that LFC Communications paid LFC Marketing’s bills and that checks written to LFC Marketing should be made out only to “LFC”; (8) evidence that William was being personally compensated for LFC Marketing’s work; and (9) evidence that William had negotiated a settlement agreement between the LFC entities and NLRC, and determined how the proceeds were to be divided.
 

 LFC Marketing presented the following evidence supporting its claim that William’s participation in LFC Marketing’s activities was minimal: (1) testimony from Robert that he made LFC Marketing’s decisions; (2) testimony from the president of NLRC that he consulted Robert for marketing decisions and William for advertising decisions, but also had joint meetings with the two; (3) testimony that the only reason William dealt more with NLRC was because the parties had agreed that there should be only one point person; and (4) testimony that inter-company checks were only used to pay “incidental expenses.”
 

 At the conclusion of the hearing, the district court made an oral ruling concluding that LFC Marketing was the alter ego of William, and thus granted the motion for writ of attachment. Further, the district court ordered that the attached funds be released to the Loomises in satisfaction of the debt owed by William.
 

 LFC Marketing appeals this order, claiming that the post-judgment writ of attachment procedure employed by the Loomises was improper and that the district court erred in allowing the corporate veil to be pierced in reverse.
 

 
 *901
 

 DISCUSSION
 

 Whether a writ of attachment may be used post-judgment to secure property to satisfy the judgment
 

 LFC Marketing argues that the unusual procedure utilized by the Loomises here—using a writ of attachment in the post-judgment context—was unprecedented and improper. Specifically, LFC Marketing contends that the statutes governing the satisfaction of judgments required the Loomises to obtain a writ of execution, not attachment, and to then issue a writ of garnishment, as the funds were in the hands of a third party, namely LFC Marketing.
 

 Typically, a writ of attachment is used as a pre-judgment remedy by which a plaintiff requests the court to secure the property of the defendant so that it may be used in satisfaction of any judgment obtained.
 
 See
 
 6 Am. Jur. 2d
 
 Attachment and Garnishment
 
 § 1 (1999). In contrast, a writ of execution is a post-judgment remedy by which a successful plaintiff requests the court to enforce the judgment by seizing and delivering property owned by the defendant in satisfaction of the debt.
 
 See
 
 30 Am. Jur. 2d
 
 Executions and Enforcement of Judgments
 
 §§ 43, 51 (1994). However, because attachment procedures are provided by statute, the issue of whether a writ of attachment may be issued post-judgment is controlled by the terms of these statutes. We have often stated that “ ‘ “[w]here the language of a statute is plain and unambiguous, and its meaning clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself.’”” Erwin v. State of Nevada, 111 Nev. 1535, 1538-39, 908 P.2d 1367, 1369 (1995) (quoting Charlie Brown Constr. Co. v. Boulder City, 106 Nev. 497, 503, 797 P.2d 946, 949 (1990) (quoting State v. Jepsen, 46 Nev. 193, 196,' 209 P. 501, 502 (1922))).
 

 The Nevada provisions regulating writs of attachment are contained in sections 31.010 through 31.220 of the Nevada Revised Statutes. In particular, NRS 31.010 provides the general rule for when such writs may issue:
 

 The plaintiff at the time of issuing the summons,
 
 or at any time thereafter,
 
 may apply to the court for an order directing the clerk to issue a writ of attachment and thereby cause the property of the defendant to be attached as security for the satisfaction of any judgment that may be recovered, unless the defendant gives security to pay such judgment as provided in this chapter.
 

 
 *902
 
 (Emphasis added.) We conclude that the plain language of this provision allows the unusual procedure of using a writ of attachment post-judgment.
 

 LFC Marketing argues that other language in the statute— namely, that a writ of attachment causes the defendant’s property “to be attached as security for the satisfaction of any judgment that may be recovered’ ’—suggests that the writ is a pre-judgment remedy only. However, we conclude that the language relied upon by LFC Marketing is ambiguous and unpersuasive in light of the plain and unambiguous provision allowing a plaintiff to apply for a writ of attachment at the time of issuance of the summons or “at any time thereafter.”
 

 We further note that under both attachment and execution procedures, the rights of third parties claiming title to the property levied upon is identical.
 
 [3]
 
 Specifically, a third party is entitled to a hearing within ten days of service of the third party’s written, verified claim to resolve title to the property.
 
 See
 
 NRS 31.070 (providing third-party hearing in writ of attachment context); NRS 21.120(2) (providing that identical hearing procedure is used for third parties in writ of execution context).
 

 Therefore, we conclude that the Loomises’ use of a writ of attachment to recover a post-judgment debt is allowed under Nevada’s existing statutory framework.
 

 Whether the district court erred in allowing the corporate veil to be pierced in reverse
 

 LFC Marketing first contends that the district court erred when it allowed the Loomises to satisfy their judgment against William out of property belonging to LFC Marketing by piercing the corporate veil in reverse. Specifically, LFC Marketing argues that there is no precedent in Nevada for such a remedy and contends that the court’s ruling resulted in fundamental unfairness to LFC Marketing by favoring the Loomises over other parties who may have an interest in the money.
 

 Nevada has long recognized that although corporations are generally to be treated as separate legal entities, the equitable remedy of “piercing the corporate veil” may be available to a plaintiff in circumstances where it appears that the corporation is acting as the alter ego of a controlling individual.
 
 See
 
 McCleary Cattle Co. v. Sewell, 73 Nev. 279, 317 P.2d 957 (1957) (early
 
 *903
 
 application of alter ego doctrine). Indeed, the “essence” of the alter ego doctrine is to “do justice” whenever it appears that the protections provided by the corporate form are being abused.
 
 See
 
 Polaris Industrial Corp. v. Kaplan, 103 Nev. 598, 603, 747 P.2d 884, 888 (1987).
 

 While the classic alter ego situation involves a creditor reaching the personal assets of a controlling individual to satisfy a corporation’s debt, the “reverse” piercing situation involves a creditor reaching the assets of a corporation to satisfy the debt of a corporate insider based on a showing that the corporate entity is really the alter ego of the individual.
 
 See generally
 
 Gregory S. Crespi,
 
 The Reverse Piercing Doctrine: Applying Appropriate Standards,
 
 16 J. Corp. L. 33, 55-69 (1990) (reviewing the case law on outsider reverse piercing). Although our case law has never directly addressed reverse piercing, most courts considering the issue have allowed such piercing.
 
 [4]
 

 See, e.g.,
 
 McCall Stock Farms, Inc. v. United States, 14 F.3d 1562, 1568 (Fed. Cir. 1993); Towe Antique Ford Foundation v. I.R.S., 999 F.2d 1387, 1390-94 (9th Cir. 1993); Zahra Spiritual Trust v. United States, 910 F.2d 240, 243-45 (5th Cir. 1990); Select Creations, Inc. v. Paliafito Am., Inc., 852 F. Supp. 740, 773-74 (E.D. Wis. 1994); Taylor v. Newton, 257 P.2d 68, 72-73 (Cal. Ct. App. 1953); Cargill, Inc. v. Hedge, 375 N.W.2d 477, 478-80 (Minn. 1985); State v. Easton, 647 N.Y.S.2d 904, 908-910 (App. Div. 1995);
 
 cf.
 
 Floyd v. I.R.S., 151 F.3d 1295, 1298-1300 (10th Cir. 1998) (criticizing reverse piercing theory because practice may unfairly prejudice innocent shareholders and harm a corporation’s ability to raise credit).
 

 Conceptually, we conclude that reverse piercing is not inconsistent with traditional piercing in its goal of preventing abuse of the corporate form. Indeed, “[i]t is particularly appropriate to apply the alter ego doctrine in ‘reverse’ when the controlling party uses the controlled entity to hide assets or secretly to conduct business to avoid the pre-existing liability of the controlling party.”
 
 Select Creations,
 
 852 F. Supp. at 774. However, it should be emphasized that “[t]he corporate cloak is not lightly thrown aside” and that the alter ego doctrine is an exception to the gen
 
 *904
 
 eral rule recognizing corporate independence. Baer v. Amos J. Walker, Inc., 85 Nev. 219, 220, 452 P.2d 916, 916 (1969). Accordingly, we conclude that reverse piercing is appropriate in those limited instances where the particular facts and equities show the existence of an alter ego relationship and require that the corporate fiction be ignored so that justice may be promoted.
 

 Whether there was substantial evidence to support the district court’s finding
 

 LFC Marketing next argues that the district court erred in finding it to be the alter ego of William because two of the requisite three elements of the doctrine were not demonstrated by substantial evidence.
 

 This court has stated that it will uphold a district court’s determination with regard to the alter ego doctrine if substantial evidence exists to support the decision.
 
 See
 
 Lorenz v. Beltio, Ltd., 114 Nev. 795, 807, 963 P.2d 488, 496 (1998). However, there is an exception to this deferential standard where it is clear that a wrong conclusion has been reached.
 
 See
 
 Polaris Industrial Corp. v. Kaplan, 103 Nev. 598, 601, 747 P2d 884, 886 (1987).
 

 The elements for finding an alter ego, which must be established by a preponderance of the evidence, are:
 

 (1) the corporation must be influenced and governed by the person asserted to be the alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the corporate fiction of a separate entity would, under the circumstances, sanction [a] fraud or promote injustice.
 

 Id.
 
 at 601, 747 P.2d at 886. Further, the following factors, though not conclusive, may indicate the existence of an alter ego relationship: (1) commingling of funds; (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as the individual’s own; and (5) failure to observe corporate formalities.
 
 See id.
 
 at 601, 747 P.2d at 887. We have emphasized, however, that “[t]here is no litmus test for determining when the corporate fiction should be disregarded; the result depends on the circumstances of each case.”
 
 Id.
 
 at 602, 747 P.2d at 887.
 

 First, LFC Marketing argues that the district court blurred the second element—unity of ownership and interest—with the first-influence and control. LFC Marketing underscores the fact that
 

 
 *905
 
 William does not own a single share of LFC Marketing, and thus argues that this element cannot be found. We disagree. Although ownership of corporate shares is a strong factor favoring unity of ownership and interest, the absence of corporate ownership is not automatically a controlling event. Instead, the “circumstances of each case” and the interests of justice should control.
 
 Id.
 
 This is especially true when considering the ease with which corporations may be formed and shares issued in names other than the controlling individual.
 
 See
 
 State v. Easton, 647 N.Y.S.2d 904, 909 (App. Div. 1995) (allowing a corporation’s assets to be reached through reverse piercing where the debtor did not own a single share of the corporation’s stock).
 

 In this case, there was evidence that William acted as the ultimate authority for all of LFC Marketing’s dealings, had negotiated the marketing agreement with NLRC personally, and did not distinguish his interest from the various Lange entities. Further, there was evidence that William considered himself to be the “president and CEO” and the “primary owner” of LFC Marketing. Additionally, there was evidence that LFC Communications paid LFC Marketing’s bills and that a common account was used among the LFC entities. Finally, there was testimony that William alone negotiated a settlement agreement with NLRC over a billing dispute and determined which of the LFC entities received the proceeds. We conclude that this evidence is adequate to support the district court’s conclusion that there was a unity of interest and ownership.
 

 Next, LFC Marketing alleges that the Loomises failed to show that adherence to the corporate entity would sanction a fraud or promote injustice. We disagree. The record reveals that the Loomises were unable to recover their judgment against William for over three years, despite William’s being the dominating force behind a Nevada corporation. Indeed, the evidence supports the district court’s conclusion that the carefully designed business arrangements between the LFC entities, William, and NLRC contributed to the Loomises’ inability to collect their judgment.
 

 We recognize, however, as the district court also did, that there are other equities to be considered in the reverse piercing situation—namely, whether the rights of innocent shareholders or creditors are harmed by the pierce.
 
 See
 
 Floyd v. I.R.S., 151 F.3d 1295, 1300 (10th Cir. 1998) (recognizing potential harm to innocent shareholders or creditors when the corporate veil is pierced in reverse); Cargill, Inc. v. Hedge, 375 N.W.2d 477, 479 (Minn. 1985). In this case, the district court found that Robert, the sole
 
 *906
 
 shareholder of LFC Marketing, would not be harmed by the attachment and that the pierce was otherwise just. We therefore conclude that the district court’s conclusion that adherence to the corporate fiction would sanction a fraud or promote injustice was supported by substantial evidence and proper under the circumstances.
 

 CONCLUSION
 

 We first conclude that the procedure of utilizing a writ of attachment in the post-judgment context is allowable under Nevada’s statutes. Next, we conclude that there are limited circumstances where the alter ego doctrine may be applied “in reverse” in order to reach a corporation’s assets to satisfy a controlling individual’s debt. Finally, we conclude that there was substantial evidence to support the district court’s ruling that LFC Marketing was the alter ego of William.
 

 Accordingly, the district court’s order granting and issuing the Loomises’ writ of attachment is affirmed.
 

 [1]
 

 The motion was made pursuant to the writ of attachment procedure of NRS 31.010. However, the motion recognizes that the attachment requested is post-judgment, in contravention to the ordinary case where attachment is a pre-judgment action.
 

 [2]
 

 NRS 31.070(5) provides that a third party—after service of a written, verified claim—is entitled to a hearing to determine title to the property levied on.
 

 [3]
 

 We also note that in this case the Loomises are particularly benefited by those provisions allowing a writ of attachment to issue without notice under certain circumstances.
 
 See
 
 NRS 31.017. Such circumstances include when the debtor resides in another state or when the property sought to be attached is in danger of being removed from the state.
 
 See id.
 

 [4]
 

 LFC Marketing contends that this court has considered the issue in Baer v. Amos J. Walker, Inc., 85 Nev. 219, 452 P.2d 916 (1969), where we denied recovery from a creditor trying to collect an individual debt from a corporation controlled by the debtor. However, the decision in
 
 Baer
 
 was based on this court’s conclusion that there was no evidence of the individual debtor’s control over the corporation or of fraud.
 
 See id.
 
 at 220-21, 452 P.2d at 917. Thus, although the
 
 Baer
 
 court recognized that the creditor was seeking to use the alter ego doctrine in reverse, it did not expressly disapprove of such use. Accordingly, the holding in
 
 Baer
 
 does not control our analysis here.