# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANICHAEAN CAPITAL, LLC, | ) | |
| CHARLES CASCARILLA, | ) | |
| EMIL KHAN WOODS, | ) | |
| LGC FOUNDATION, INC. and | ) | |
| IMAGO DEI FOUNDATION, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **C.A. No. 2020-0601-JRS** |
| | ) | |
| EXELA TECHNOLOGIES, INC., | ) | |
| EX-SIGMA LLC, | ) | |
| BANCTEC (PUERTO RICO), INC. | ) | |
| BANCTEC GROUP, LLC | ) | |
| BANCTEC INTERMEDIATE HOLDING, INC. | ) | |
| BANCTEC, INC. | ) | |
| BILLSMART SOLUTIONS, LLC | ) | |
| BTC INTERNATIONAL HOLDINGS, INC. | ) | |
| BTC VENTURES, INC. | ) | |
| CHARTER LASON, INC. | ) | |
| CORPSOURCEHOLDINGS, LLC | ) | |
| DELIVEREX LLC | ) | |
| DFG UK, LLC | ) | |
| DFG2 HOLDINGS, LLC | ) | |
| DFG2, LLC | ) | |
| ECONOMIC RESEARCH SERVICES, INC. | ) | |
| EXELA INTERMEDIATE HOLDINGS LLC | ) | |
| EXELA INTERMEDIATE LLC | ) | |
| EXELA FINANCE INC. | ) | |
| EXELA ENTERPRISE SOLUTIONS, INC. | ) | |
| EXELA RECEIVABLES HOLDCO LLC | ) | |
| EXELA RE LLC | ) | |
| EXELA RECEIVABLES 1, LLC | ) | |
| EXELA RECEIVABLES 2, LLC | ) | |
| FTS PARENT, INC. | ) | |
| HOV ENTERPRISE SOLUTIONS, INC. | ) | |
| HOV SERVICES, INC. | ) | |

HOV SERVICES, LLC )
J&B SOFTWARE, INC. )
KINSELLA MEDIA, LLC )
LASON INTERNATIONAL, INC. )
MANAGED CARE PROFESSIONAL, LLC )
PANGEA ACQUISITIONS, INC. )
RC4 CAPITAL, LLC )
REGULUS AMERICA, LLC )
REGULUS GROUP II, LLC )
REGULUS GROUP, LLC )
REGULUS HOLDING, INC. )
REGULUS INTEGRATED SOLUTIONS, LLC )
REGULUS WEST, LLC )
RUSTIC CANYON III, LLC )
SOURCECORP BPS, INC. )
SOURCECORP BPS NORTHERN )
CALIFORNIA INC. )
SOURCEHOV HEALTHCARE, INC. )
SOURCEHOV HOLDINGS, INC. )
SOURCEHOV LLC )
SOURCECORP LEGAL, INC. )
SOURCECORP, INCORPORATED )
TRAC HOLDINGS, LLC )
TRANSCENTRA, INC. )
UNITED INFORMATION SERVICES, INC. )
SOURCECORP MANAGEMENT, INC. )
)
　　　　　　　Defendants. )


**OPINION**


Date Submitted:  February 25, 2021
Date Decided:  May 25, 2021

Rudolf Koch, Esquire, Matthew W. Murphy, Esquire and Andrew L. Milam, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Samuel J. Lieberman, Esquire and Alexander H. McCabe, Esquire of Sadis & Goldberg LLP of New York, New York; and Steven K. Davidson, Esquire, Michael J. Baratz, Esquire, Claire Schachter, Esquire and Lauren Goldschmidt, Esquire of Steptoe & Johnson LLP, Washington, DC, Attorneys for Plaintiffs.

T. Brad Davey, Esquire, Matthew F. Davis, Esquire and Andrew H. Sauder, Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware and Jennifer Barrett, Esquire, Dennis H. Hranitzky, Esquire and Blair Adams, Esquire of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

Under the Delaware General Corporation Law, a board of director's decision to cause the company it serves to merge leaves the company's stockholders with one of two options: participate in the merger as negotiated by the board, or dissent to the merger and seek statutory appraisal. It has not always been this way. At common law, all major corporate decisions, including whether to merge, required unanimous stockholder consent, providing each and every shareholder an effective veto power over any corporate transaction.[1] That veto right created an unhealthy phenomenon known as "nuisance blocking," where a single stockholder could withhold consent to a merger in order to extract hold up consideration. This dynamic, and others, prompted the Delaware General Assembly to create a statutory right of appraisal as a means to quash the minority's blocking right while also addressing the non-consensual taking of the stockholders' property (their stock).[2]

---

[1] *In re Appraisal of Transkaryotic Therapies, Inc.*, 2007 WL 1378345, at *3 (Del. Ch. May 2, 2007) ("Historically, all major corporate decisions required unanimous shareholder consent. This requirement created a veto power and allowed even a single shareholder to obstruct corporate action.").

[2] *Id.*

The plaintiffs here, former stockholders of SourceHOV Holdings, Inc., ("SourceHOV Holdings")[3] dissented when presented with the decision of the SourceHOV Holdings board of directors to merge the company with Exela Technologies, Inc., and then sought statutory appraisal of their SourceHOV Holdings shares. They pursued their appraisal rights at great costs, both opportunity and financial, and were vindicated in their efforts when the court awarded them an appraisal judgment reflecting their shares were worth well in excess of what they were offered in the merger. SourceHOV Holdings appealed and the plaintiffs prevailed again. Following the entry of final judgment, the court entered a charging order against SourceHOV Holdings' interests in its subsidiaries to facilitate the payment of the judgment. Yet the judgment remains unsatisfied.

Confronted with the highly unusual circumstance where an appraisal judgment debtor cannot or will not pay, the plaintiffs in this action, and in a parallel action,[4] seek to hold Exela (as acquirer) and its affiliated entities accountable for the appraisal judgment.[5] According to the plaintiffs, as the appraisal action was nearing

---

[3] There are several "SourceHOV" entities involved in this action. For the sake of precision, and at the risk of occasional redundancy, I will refer to SourceHOV Holdings by its full name.

[4] *Manichaean v. Chadha, et al.*, No. 2020-0711-JRS, 2021 WL 229480 (Del. Ch. Aug. 27, 2020) (COMPLAINT).

[5] *See generally* Verified Compl. ("Compl.") (D.I. 1).

2

its inevitable conclusion, and since the appraisal judgment and subsequent charging order were entered against SourceHOV Holdings, Exela and its subsidiaries have been executing a scheme to prevent post-merger SourceHOV Holdings from paying the judgment.

Against this backdrop, the plaintiffs seek to hold Exela and its subsidiaries liable under two theories: (1) given the abuse of corporate form by Exela and its subsidiaries, principally through fraudulent maneuvers, the Court should pierce the SourceHOV Holdings corporate veil upwards to reach Exela and downwards to reach SourceHOV Holdings' solvent subsidiaries so that Plaintiffs can enforce their charging order against these entities; and (2) given that Exela now holds a 100% stake in SourceHOV Holdings but has refused to pay all SourceHOV Holdings stockholders for their share of the company, the Court should determine that Exela was unjustly enriched and order it to pay the plaintiffs restitution in the amount of the appraisal judgment plus interest.

Plaintiffs' well-pled allegations support a reasonable inference that Exela, lacking in corporate formality, engaged in a transaction, as described in the plaintiffs' complaint, for the purpose of preventing funds that would otherwise flow from SourceHOV Holdings' subsidiaries directly to SourceHOV Holdings to flow instead directly to Exela, thereby leaving the judgment debtor unable to satisfy the plaintiffs' appraisal judgment. Because the charging order requires any money

3

flowing through SourceHOV Holdings first to be paid to the judgment creditors, including the plaintiffs, Exela's participation in a scheme to deprive SourceHOV Holdings of those funds has conceivably rendered the charging order worthless parchment. This supports the plaintiffs' prayer for relief in the form of traditional veil-piercing (i.e., piercing SourceHOV Holdings' corporate veil to reach upwards to Exela).

It is likewise reasonably conceivable that SourceHOV Holdings' subsidiaries knowingly participated in the wrongful scheme, such that the plaintiffs' prayer for relief in the form of reverse veil-piercing (i.e., piercing SourceHOV Holdings' corporate veil to reach downwards to its wholly owned subsidiaries) is likewise appropriate. The legality of reverse veil-piercing appears to be a matter of first impression in Delaware. After carefully reviewing the justifications for and against the adoption of reverse veil-piercing, I find that this equitable remedy (or right) is an appropriate means, in limited circumstances, to remedy fraud and injustice.[6] Under the framework set out below, the plaintiffs' claim for reverse veil-piercing, which, again, seeks to hold SourceHOV Holdings' subsidiaries liable for its debts, is, I believe, viable as a matter of Delaware law.

---

[6] *See Medi-Tec of Egypt Corp. v. Bausch & Lomb Surg.*, 2004 WL 415251, at *2 (Del. Ch. Mar. 4, 2004) (noting "it is not necessarily clear under Delaware law whether veil piercing is an equitable right or an equitable remedy").

4

On the other hand, the plaintiffs' claim for unjust enrichment is not viable because the charging order, as a matter of law, prevents the use of equitable claims and remedies, such as unjust enrichment, as separate means to reach LLC assets that are subject to the charging order. The unjust enrichment claim, consequently, must be dismissed.

The procedural posture in which these issues are presented to the Court is a motion to dismiss all claims under Court of Chancery Rule 12(b)(6). For reasons stated below, the motion is granted in part and denied in part.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Complaint (the "Complaint") and documents incorporated by reference or integral to that pleading.[7] For purposes of the motion, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in the plaintiffs' favor.[8]

### A. Parties

Plaintiff, Manichaean Capital, LLC, a Delaware LLC, along with individual plaintiffs, Charles Cascarilla and Emil Woods, both New York residents, and LGC Foundation, Inc. and Imago Dei Foundation, Inc., both Ohio corporations,

---

[7] Compl.; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[8] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

5

(collectively, "Plaintiffs"), were equity holders in SourceHOV Holdings prior to its acquisition by Exela in a merger consummated on July 12, 2017.[9]

Defendant, Exela, a Delaware corporation, sits atop a network of "resident and non-resident direct and indirect subsidiaries," many of which have been named as defendants here (the "Exela Subsidiaries").[10] Exela operates in the business process automation space.

The Exela Subsidiaries include: Ex-Sigma LLC, the Delaware LLC formed to combine with SourceHOV Holdings in the Merger, SourceHOV Holdings, the surviving entity from the Merger, SourceHOV, LLC, an entity immediately below SourceHOV Holdings in which SourceHOV Holdings maintains a 100% membership interest, and then a number of subsidiary LLCs, which I refer to as the "SourceHOV Subsidiaries."[11] The Exela network is depicted in the chart below:

*Remainder of Page Intentionally Left Blank*

---

[9] Compl. ¶¶ 12–16, 33.

[10] Compl. ¶¶ 17, 19–21.

[11] Compl. ¶¶ 17–21.



## B. The Merger

On July 12, 2017, SourceHOV Holdings merged with Ex-Sigma LLC and Ex-Sigma Merger Sub, Inc., in a transaction whereby each share of SourceHOV Holdings common stock was converted into a right to receive one membership unit of Ex-Sigma LLC (the "Merger").[12]  Prior to the Merger, Plaintiffs held 10,304 shares of common stock in SourceHOV Holdings.[13]  The creation of Ex-Sigma and subsequent conversion of stock was a preliminary step to effectuate the merger of SourceHOV Holdings into SourceHOV Merger Sub, with SourceHOV Holdings

---

[12] Compl. ¶ 33.

[13] Compl. ¶ 31.

7

emerging as the surviving entity.[14]  The Merger made SourceHOV Holdings an indirect subsidiary of Quinpario Acquisition Corp. 2, which was later renamed Exela.[15]

Under the Consent, Waiver and Amendment to the Business Combination Agreement (the "Modification Agreement"), dated June 15, 2017, any Merger consideration was to be delivered to Ex-Sigma LLC without deductions for dissenting shares.[16]  The Modification Agreement declared that if a stockholder sought appraisal, Ex-Sigma would send that stockholder's equity interests in SourceHOV Holdings to Exela.[17]

## C. The Appraisal Action

Plaintiffs expressly dissented with respect to the Merger and, on September 27, 2017, filed an appraisal action in this court (the "Appraisal Action").[18]  This Court issued its post-trial memorandum opinion on January 30,

---

[14] Compl. ¶ 34.

[15] *Id.* For a more comprehensive discussion of the mechanics of the Merger, interested readers are referred to *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 496606, at *7 (Del. Ch. Jan. 30, 2020), *aff'd*, 2021 WL 225817 (Del. Jan. 22, 2021) ("*Manichaean Appraisal Action*").

[16] Compl. ¶¶ 54, 57.

[17] Compl. ¶ 57.

[18] Compl. ¶¶ 35–36.

2021.[19]  As is typical in appraisal litigation, the parties' experts were miles apart in their determinations of SourceHOV Holdings' fair value as of the Merger.  For reasons stated in the post-trial opinion, the Court, in large measure, adopted the petitioners' fair value evidence and appraised the fair value of their shares in SourceHOV Holdings at the time of the Merger at $4,591 per share.[20]  This valued the petitioners' stake at $57,684,471 plus interest, significantly above the consideration they would have received in the Merger.[21]  The Court entered its final judgment to this effect on March 26, 2020 (the "Appraisal Judgment").[22] SourceHOV Holdings moved for reargument and then for a new trial; both motions were denied.[23]  SourceHOV Holdings appealed the Appraisal Judgment and our Supreme Court summarily affirmed.[24]

---

[19] Compl. ¶ 40.

[20] Compl. ¶ 37; *Manichaean Appraisal Action*, 2020 WL 496606, at *2.

[21] Compl. ¶ 50.

[22] *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 1511189 (Del. Ch. Mar. 26, 2020) (ORDER) ("*Manichaean Appraisal Action Final Order*").

[23] *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020); *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 3097678 (Del. Ch. June 11, 2020); Compl. ¶¶ 41, 44.

[24] Compl. ¶ 45; *SourceHOV Hldgs., Inc. v. Manichaean Cap., LLC*, 2021 WL 225817 (Del. Jan. 22, 2021) (ORDER).

While the appeal was pending, Plaintiffs sent a demand letter to SourceHOV Holdings requesting immediate payment of the Appraisal Judgment.[25]  As of the filing of this lawsuit, none of that judgment had been paid.[26]  According to Plaintiffs, when Ex-Sigma transferred Plaintiffs' SourceHOV Holdings shares to Exela over their dissent to the Merger, shares that constituted 6.5% of SourceHOV Holdings' outstanding stock, and then Exela subsequently failed to pay the $57.6 million owed for that stock as determined by the Appraisal Judgment, Exela, in essence, seized Plaintiffs' property without paying for it.[27]

**D. The Charging Order**

On July 15, 2020, Plaintiffs filed a Motion for Charging Order against SourceHOV Holding's membership interest in SourceHOV, LLC.[28]  The Court granted the Motion on August 15, 2020.[29]  The charging order mandated that "[a]ny and all distributions made by SourceHOV, LLC and payable to SourceHOV Holdings, Inc. in respect of SourceHOV Holdings, Inc.'s membership interest in

---

[25] Compl. ¶ 47.

[26] Compl. ¶ 50.  Since the filing, the Court was advised in related litigation that SourceHOV has paid $1 million toward the judgment.  *Manichaean v. Chadha, et al.*, C.A. No. 2020-0711-JRS (D.I. 73).

[27] Compl. ¶ 62.

[28] Compl. ¶ 49.

[29] *Manichaean Cap., LLC v. SourceHOV Hldgs., Inc.*, 2020 WL 5074386 (Del. Ch. Aug. 25, 2020) (ORDER).

10

SourceHOV, LLC shall be paid to [Plaintiffs]" (the "Charging Order").[30]  In other words, to the extent Exela, as parent of SourceHOV Holdings, wishes to receive distributions from its subsidiaries below SourceHOV Holdings, any money that flows through SourceHOV Holdings must first be paid to Plaintiffs as SourceHOV Holdings' judgment creditors before it reaches Exela.

## E.  The A/R Facility

On January 10, 2020, mere weeks before this Court's decision in the Appraisal Action, Exela, through its subsidiaries, entered into a $160 million accounts receivable securitization facility (the "A/R Facility").[31]  To facilitate the transaction, Exela created two entities, Exela Receivables Holdco LLC ("Receivables Holdco") and Exela Receivables I LLC ("Receivables I").[32]  Under the First Tier Purchase and Sale Agreement, thirteen of the SourceHOV Subsidiaries sold their accounts receivable to Receivables Holdco.[33]  Then, under the Second Tier Purchase Agreement, Receivables Holdco sold those receivables to Receivables I.[34]  Under the Loan and Security Agreement, Receivables I then pledged the receivables as

---

[30] *Id.* at ¶ 3.

[31] Compl. ¶ 136.

[32] Compl. ¶¶ 136–39.

[33] Compl. ¶ 138.

[34] Compl. ¶ 139.

11

collateral for loans and letters of credit to be issued to Receivables I.[35] More specifically, Receivables I pledged certain collection accounts, including sixteen "Interim Collection Accounts," all but three of which were accounts owned directly by the SourceHOV Subsidiaries.[36] The A/R Facility permitted value once held by the SourceHOV Subsidiaries to be held by Exela's indirect subsidiary, allowing a diversion of funds around SourceHOV Holdings and directly into the coffers of Exela.[37]

## II. ANALYSIS

The standard for deciding a Motion to Dismiss under Court of Chancery Rule 12(b)(6) is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[38]

---

[35] Compl. ¶ 140.

[36] Compl. ¶ 141.

[37] Compl. ¶ 144.

[38] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citation omitted).

## A. The Rationale for Statutory Appraisal

The creation of a statutory appraisal right was a significant step forward in the development of our corporate law. Before then, at common law, "an arbitrary minority" could prevent a transformative transaction with the wave of a hand, holding the majority hostage to their whim.[39] The appraisal right granted under 8 *Del. C.* § 262 is a "statutory right . . . given [to] the shareholder as compensation for the abrogation of the common law rule that a single shareholder could block a merger."[40] The right is significant and reflects the reality that our law now allows a corporation's majority owners to force a sale of the corporation, and the minority's equity in the corporation, without minority consent and even when the price paid in the transaction may be deemed by the minority to be inadequate. For this result to make sense, the dissenting shareholders must have a means to secure fair value through a proper appraisal of their shares.[41] And, importantly, the dissenting

---

[39] *Salomon Bros. Inc. v. Interstate Bakeries Corp.*, 576 A.2d 650, 651 (Del. Ch. 1989).

[40] *Id.* (quoting *Francis I. duPont & Co. v. Universal City Studios*, 343 A.2d 629, 634 (Del. Ch. 1975)).

[41] Saul Levmore & Hideki Kanda, *The Appraisal Remedy and the Goals of Corporate Law*, 32 UCLA L. Rev. 429, 434 (1985) ("The conventional view is built on the idea that appraisal statutes have sought to protect minority shareholders. . . . [A]ppraisal retains the flavor of minority veto power."). *See also Matter of Appraisal of Ford Hldgs. Pref. S'holders*, 698 A.2d 973, 976 (Del. Ch. 1997) (Allen, C.) (holding that statutory appraisal rights are among those set forth in the Delaware General Corporation Law that are "mandatory").

shareholder should, absent compelling circumstances, actually *get paid* the fair value of "that which has been taken from him."[42]  Anything less frustrates the origin and purpose of the statutory appraisal remedy.

In the ordinary course, when judgment debtors fail to pay, the legal remedies of a charging order against a judgment debtor's LLC interests or a writ of execution against the judgment debtor's assets are available as tools for collection.[43]  This Opinion considers what options are available to the judgment debtor in an appraisal action if, after a plaintiff receives a writ of execution or charging order, an appraisal judgment is still left unpaid.  In considering the question, it is useful to remember that in appraisal actions, it is the acquirer, not the target, who is "the real party in interest on the respondent's side of the case."[44]

---

[42] *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950); s*ee also ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 929 (Del. Ch. 1999) ("[The] appraisal statute [has a] goal of preventing the . . . corporation from retaining unjust benefits from the use of the dissenting shareholders' funds.").

[43] 6 *Del. C.* § 18-703(a); *Manichaean Appraisal Action Final Order*, 2020 WL 1511189, at *1 ("This Final Order and Judgment may be enforced in Delaware by the issuance of writs of execution substantially in the form and with the same effect as those used in Delaware Superior Court, as provided in Court of Chancery Rule 69(a), and by any other means allowed by applicable law or procedure in any jurisdiction where enforcement is sought.").

[44] *In re Appraisal of Columbia Pipeline Gp., Inc.*, 2019 WL 3778370, at *17 (Del. Ch. Aug. 12, 2019) ("Although technically the respondent in an appraisal proceeding is the surviving company, the acquirer is typically the real party in interest on the respondent's side of the case."); *see also In re Stillwater Mining Co.*, 2019 WL 3943851, at *1 (Del. Ch. Aug. 21, 2019) ("The respondent in an appraisal proceeding is technically the surviving corporation, but the real party in interest is the acquirer."); E. Thom Rumberger, Jr.*,*

14

## B. The Impact of the Charging Order

Upon request by a judgment creditor of a member of a Delaware limited liability company, the court "may charge the limited liability company interest of the judgment debtor to satisfy the judgment."[45] Once entered, the charging order acts as a lien on the judgment debtor's membership interest.[46] Importantly, 6 *Del. C.* § 18-703(d) provides that "a charging order is the exclusive remedy by which a judgment creditor of a member or a member's assignee may satisfy a judgment out of the judgment debtor's limited liability company interest and attachment, garnishment, foreclosure or other legal or equitable remedies are not available to the judgment creditor . . . ."[47] In this regard, Section 18-703(e) makes clear that a creditor who obtains a charging order does not maintain "any right to obtain

---

*The Acquisition and Sale of Emerging Growth Companies: The M & A Exit* § 11:33 (2d ed. 2017) ("From an acquirer's perspective, target stockholders pursuing appraisal rights create uncertainty as to how much [the] acquirer will have to pay for the shares of target."); Joseph Evan Calio, *New Appraisals of Old Problems: Reflections on the Delaware Appraisal Proceeding*, 32 Am. Bus. L.J. 1, 68 n.64 (1994) ("[E]ither in the market or in an appraisal the acquiror pays the entire bill no matter how it is apportioned."); Ethan Klingberg & Yavor Efremov, *Delaware's M&A Wildcard-Appraisal Rights*, 9 No. 2 M & A Law. 1 (June 2005) (discussing the effects of dissenting target shareholders on the acquirer's pre- and post-acquisition role).

[45] 6 *Del. C.* § 18-703(a).

[46] 6 *Del. C.* § 18-703(b).

[47] 6 *Del. C.* § 18-703(d).

possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company."[48]

While the charging order statute clearly limits the types of actions a judgment creditor may take against a debtor to fulfill its judgment once the charging order is in hand, it does not limit the means by which the judgment debtor may enforce the charging order itself. To the extent a judgment creditor seeks merely to define which entities are (or should be) subject to the charging order, that action is not barred by the charging order statute. That is precisely what Plaintiffs' veil-piercing claims seek to do here.

On the other hand, if a judgment creditor seeks to bypass its charging order to enforce its judgment through "other legal or equitable remedies," that action is barred by statute and must be dismissed.[49] That is what Plaintiffs seek to do through their unjust enrichment claim. I address the effects of the Charging Order more specifically below as I address each of Plaintiffs' claims in turn.[50]

---

[48] 6 *Del. C.* § 18-703(e).

[49] 6 *Del. C.* § 18-703(d).

[50] I note that Defendants have not argued that the charging order bars Plaintiffs' traditional veil-piercing claim but have argued that it bars the reverse veil-piercing claim. Defs.' Opening Brief in Supp. of Mot. to Dismiss the Verified Compl. (D.I. 11) ("OB") at 21. This is likely because a charging order is the exclusive remedy as against a judgment debtor's LLC interests and SourceHOV's LLC interests sit below SourceHOV Holdings, hence the claim for reverse veil-piercing.

## C. Traditional Veil-Piercing

Plaintiffs allege that Exela's undercapitalization of its subsidiary (SourceHOV Holdings), lack of corporate separateness and subsequent attempts to divert funds away from SourceHOV Holdings to avoid the claims of its creditors provide ample bases to pierce SourceHOV Holdings' corporate veil to reach up the chain to Exela. "Delaware public policy disfavors disregarding the separate legal existence of business entities."[51] With that said, in "exceptional case[s]," corporate veil-piercing is necessary and appropriate.[52]

Delaware courts consider a number of factors in determining whether to disregard the corporate form and pierce the corporate veil, including: "(1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the dominant shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the dominant shareholder."[53] While these factors are useful, any single one of them is not determinative. An ultimate

---

[51] *Paul Elton, LLC v. Rommel Del., LLC*, 2020 WL 2203708, at *14 (Del. Ch. May 7, 2020); *see also Wallace ex rel. Cencom Cable Income P'rs II, L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task." (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989))).

[52] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 49 (Del. Ch. 2012).

[53] *Doberstein v. G-P Indus., Inc.*, 2015 WL 6606484, at *4 (Del. Ch. Oct. 30, 2015).

17

decision regarding veil-piercing is largely based on some combination of these factors, in addition to "an overall element of injustice or unfairness."[54]

As to the specific factors, Plaintiffs make a compelling case in their Complaint that Exela and SourceHOV Holdings "operate[] as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them."[55] First, accepting the allegations in the Complaint as true, it is reasonably conceivable that SourceHOV Holdings is insolvent and that its insolvency, at least in part, is the result of Exela's undercapitalization of SourceHOV Holdings. Insolvency is adequately pled if a plaintiff's allegations allow a reasonable inference of either "(1) a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business.'"[56]

---

[54] *Id.*; *see also Gadsden v. Home Pres. Co.*, 2004 WL 485468, at *4 (Del. Ch. Feb. 20, 2004, revised Mar. 12, 2004) ("A court of equity will disregard the separate legal existence of a corporation where it is shown that the corporate form has been used to perpetrate a fraud or similar injustice."); *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988) ("[N]o single factor could justify a decision to disregard the corporate entity, but . . . some combination of them [is] required, and . . . an overall element of injustice or unfairness must always be present . . . .").

[55] *Mabon, Nugent & Co. v. Texas Am. Energy Corp.*, 1990 WL 44267, at *5 (Del. Ch. Apr. 12, 1990).

[56] *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 98 (Del. 2007) (cleaned up).

18

SourceHOV Holdings is a holding company with no direct operating assets.[57] In fact, its only asset is its membership interest in SourceHOV, LLC, which in turn holds interests in its solvent subsidiaries.[58] SourceHOV Holdings has no bank account, money market account or brokerage account.[59] With those facts as background, the Complaint alleges funds that once flowed up from the SourceHOV Subsidiaries to SourceHOV Holdings as a matter of course, are now bypassing SourceHOV Holdings and flowing directly to Exela.[60] According to Plaintiffs, this arrangement was put in place by Exela and others while the likelihood that SourceHOV Holdings would face a substantial appraisal judgment was well known to all involved in the A/R Facility.[61] Now that SourceHOV Holdings has no funds, and no prospect of securing funds, it is unable to meet its obligations as they become due, and it is at least reasonably conceivable that it will never be able to do so. The fact that certain of the SourceHOV Subsidiaries might be profitable, say Plaintiffs, does not suggest that SourceHOV Holdings itself is solvent, absent evidence that

---

[57] Compl. ¶ 82.

[58] Compl. ¶ 84.

[59] *Id.*

[60] Compl. ¶ 29.

[61] Compl. ¶ 148.

such money flows through SourceHOV Holdings, which, according to the Complaint, is not and may never again be the case.

The Complaint's case for veil-piercing does not rest on insolvency alone.[62] It alleges that Exela was aware of SourceHOV Holdings' potential liability long ago and yet made a deliberate decision to undercapitalize the entity.[63] Exela knew at the time it acquired SourceHOV Holdings that dissenting shareholders would be entitled to the fair value of their shares.[64] Indeed, Exela recognized in its Form 10-K, filed on March 16, 2018, that there was a risk of a significant loss associated with the Appraisal Action.[65] It corrected its past filings in an 8-K filed on March 17, 2020, and was even more explicit in disclosing that the obligation to pay fair value to dissenting shareholders represented an obligation on the date the Appraisal Action was filed in September 2017.[66] Yet, notwithstanding its recognition of substantial exposure to the appraisal petitioners, Exela made the deliberate decision to avoid

---

[62] Defendants argue that insolvency, alone, is not enough to pierce the corporate veil. *Mason v. Network of Wilm., Inc.*, 2005 WL 1653954, at *4 (Del. Ch. July 1, 2005) ("[I]nsolvency, with nothing more, is not sufficient to warrant the piercing of the corporate veil"). I agree. But Plaintiffs allege more.

[63] Compl. ¶¶ 87–103.

[64] Compl. ¶ 87.

[65] Compl. ¶ 94.

[66] Compl. ¶ 98.

20

flowing funds through SourceHOV Holdings.[67]  With funds either remaining at the subsidiary level or potentially flowing around SourceHOV Holdings to Exela, there is no way for Plaintiffs to enforce their judgment against SourceHOV Holdings.[68]

Beyond the apparently deliberate effort to starve SourceHOV Holdings of cash, Plaintiffs further allege that Exela failed to observe certain corporate formalities.  Specifically, Plaintiffs allege that Exela: (1) is headquartered at the same address as SourceHOV Holdings,[69] (2) has failed to maintain proper business registrations for SourceHOV Holdings,[70] (3) has significantly overlapping personnel with SourceHOV Holdings,[71] (4) has referred to Exela and its subsidiaries as one

---

[67] Compl. ¶¶ 6, 28.

[68] Compl. ¶¶ 7, 29.

[69] Compl. ¶ 125.

[70] Compl. ¶ 126.

[71] Compl. ¶ 129 ("Chadha was the principal stockholder of SourceHOV immediately prior to the business combination and is now Exela's Executive Chairman.  Ronald Cogburn is the Chief Operating Officer of Exela and an officer, director, general partner, or manager of SourceHOV LLC.  Jim Reynolds is a member of Exela's board of directors and treasurer of SourceHOV LLC.  Mark Fairchild is president of Exela Smart Office and president of SourceHOV LLC.  Shrikant Sortur is the Chief Financial Officer of Exela and an officer of SourceHOV LLC.  Eric Mengwall serves as secretary for both Exela and SourceHOV LLC.").

21

combined enterprise in SEC filings[72] and (5) requires SourceHOV Holdings to obtain Exela's consent before SourceHOV Holdings may pay its own creditors.[73]

With concerns about insolvency, undercapitalization and corporate formalities well pled, Plaintiffs turn next to the fraud and injustice associated with the A/R Facility. "Acts intended to leave a debtor judgment proof are sufficient to show fraud and injustice."[74] Plaintiffs compellingly allege that fraud and injustice has resulted and will result from the diversion of funds from SourceHOV Holdings to Exela in an explicit attempt to avoid payment of the Appraisal Judgment. As mentioned, Exela knew that SourceHOV Holdings would be required to pay a judgment of some amount, at the latest, when Plaintiffs sent their appraisal demand in September 2017.[75] The extent of that exposure became all too clear as the appraisal petitioners developed evidence, including expert valuation evidence, that

---

[72] Compl. ¶ 131.

[73] Compl. ¶ 133. Again, Defendants argue that the failure to observe corporate formalities, alone, is not sufficient to well-plead veil-piercing. *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *6 (Del. Ch. Nov. 13, 2018) ("A parent corporation is not liable for the acts of its subsidiary merely because it owns (and votes) a majority of the subsidiary's stock or shares common shareholders, directors or officers with the subsidiary."). Once again, I agree. But, a combination of insolvency, intentional undercapitalization and a lack of corporate formalities, coupled with valid claims of fraud and injustice, is enough to meet Plaintiffs' pleading stage burden.

[74] *Compagnie des Grands Hotels d'Afrique S.A. v. Starwood Cap. Gp. Glob. I LLC*, 2019 WL 148454, at *5 (D. Del. Jan. 9, 2019).

[75] Compl. ¶¶ 35–36.

the fair value of SourceHOV Holdings was exponentially greater than the price paid in the Merger. This evidence was presented at trial in June 2019, summarized in post-trial oral arguments in October 2019, then relied upon in the Court's post-trial decision issued on January 30, 2020.[76] Yet, mere weeks before entry of the judgment, on January 10, 2020, Defendants entered into the A/R Facility.[77]

According to the Complaint, and as discussed above, the A/R Facility created a structure whereby thirteen of the SourceHOV Subsidiaries sold certain receivables to Receivables Holdco, and those receivables were subsequently sold to Receivables I.[78] As designed, Receivables I, an indirect subsidiary of Exela but *not* SourceHOV Holdings, pledged those receivables as collateral under the Loan and Security Agreement in exchange for money paid by the lender under the facility.[79] Exela is the guarantor for all moneys borrowed under the A/R Facility and is the servicer on the Loan and Security Agreement.[80] According to Plaintiffs' well-pled allegations, the receivables pledged were not Exela's to pledge and yet, as a result

---

[76] Compl. ¶¶ 38, 40.

[77] Compl. ¶¶ 39, 136.

[78] Compl. ¶¶ 138–139.

[79] Compl. ¶ 140.

[80] Compl. ¶¶ 136, 140.

of the pledge, accounts receivable income that should flow up to SourceHOV Holdings no longer does.[81]

Defendants take issue with the Complaint's pled characterization of the A/R Facility. The arguments are granular and, if accepted, would re-write Plaintiffs' pleading. To be sure, the A/R Facility is a complicated transaction. And Defendants' characterization of it may well prove to be the better one. But this is not the time to make that potentially dispositive determination, particularly given the fact-intensive intricacies of the transaction.[82] Taking Plaintiffs' well-pled characterization as fact, it is reasonably conceivable the A/R Facility was created in order deliberately to prevent funds from flowing through SourceHOV Holdings and to enable SourceHOV Holdings to avoid its obligations to creditors, including, and perhaps especially, Plaintiffs. Assuming the pled facts are true, it is reasonably

---

[81] Compl. ¶ 144.

[82] *Doe 30's Mother v. Bradley*, 58 A.3d 429, 445 (Del. Super. Ct. 2012) ("While it is true that the Court need not accept conclusory assertions as true when deciding a motion to dismiss, the Court will not adjudicate contested issues of fact on a motion to dismiss, nor will it deem a pleading inadequate under Rule 12(b)(6) simply because a defendant presents facts that appear to contradict those plead by the plaintiff."); *Malpiede v. Townson*, 780 A.2d 1075, 1082 (Del. 2001) ("[On] a motion to dismiss . . . the Court of Chancery may not resolve material factual disputes . . . ."); *Windy City Invs. Hldgs., LLC v. Tchrs. Ins. & Annuity Ass'n of Am.*, 2019 WL 2339932, at *10 (Del. Ch. May 31, 2019) ("[Defendant's] efforts to refute [plaintiff's] version of the facts are not appropriate at the motion to dismiss stage, where [plaintiff] has pled its allegations adequately.").

24

conceivable that it is necessary to pierce the SourceHOV Holdings corporate veil to avoid fraud and injustice.

## D. Reverse Veil-Piercing

The question of whether and to what extent courts of Delaware should allow so-called reverse veil-piercing is one of first impression. This is not to say that parties in litigation have not asked our courts to authorize reverse veil-piercing. They have. But our courts have yet to accept or deny the claim.[83] For reasons explained below, I am satisfied that Delaware law allows for reverse veil-piercing in limited circumstances and in circumscribed execution.

### 1. The Mechanics of Reverse Veil-Piercing and its Proper Application

At its most basic level, reverse veil-piercing involves the imposition of liability on a business organization for the liabilities of its owners.[84] In the parent/subsidiary context, "where the subsidiary is a mere alter ego of the

---

[83] *See, e.g.*, *Cancan Dev., LLC v. Manno*, 2015 WL 3400789, at *22 (Del. Ch. May 27, 2015), *aff'd*, 132 A.3d 750 (Del. 2016) (noting that "[h]ad the claim [for reverse veil-piercing] been properly presented" it "might have prevailed," but because "[n]o one grappled with the different implications" of reverse veil-piercing and traditional veil-piercing, the claim failed for lack of adequate prosecution); *Spring Real Estate, LLC v. Echo/RT Hldgs., LLC*, 2016 WL 769586, at *3 (Del. Ch. Feb. 18, 2016) (explaining the doctrine of "reverse veil-piercing" but ultimately declining to address its validity).

[84] *Sky Cable, LLC v. DIRECTV, Inc.*, 886 F.3d 375, 385 (4th Cir. 2018) ("Reverse veil piercing attaches liability to the entity for a judgment against the individuals who hold an ownership interest in that entity."); *Litchfield Asset Mgmt. Corp. v. Howell*, 799 A.2d 298, 311 (2002) (Conn. App. Ct. 2002) (defining reverse veil-piercing as when "the assets of the corporate entities [are] made available to pay the personal debts of an owner").

parent . . . the Court [will] treat the assets of the subsidiary as those of the parent."[85]

As the doctrine has evolved, courts now recognize two variants of reverse veil-piercing: insider and outsider reverse veil-piercing.[86]  Insider reverse veil-piercing is implicated where "the controlling [member] urges the court to disregard the corporate entity that otherwise separates the [member] from the corporation."[87]  Outsider reverse veil-piercing is implicated where "an outside third party, frequently a creditor, urges a court to render a company liable on a judgment against its member."[88]  Given Plaintiffs are creditors of SourceHOV Holdings, the single member and 100% owner of SourceHOV LLC, which in turn is the single member and owner of the SourceHOV Subsidiaries, and Plaintiffs seek to hold the subsidiaries liable for a judgment held against the member, this case concerns outsider veil-piercing.

The case associated with the first substantive treatment of reverse veil-piercing is Judge Learned Hand's decision in *Kingston Dry Dock Co. v. Lake*

---

[85] *Spring Real Estate*, 2016 WL 769586, at *3.

[86] *Sky Cable*, 886 F.3d at 385.

[87] *Id.* (quoting 1 W. Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 41 (2017)); *McKay v. Longman*, 211 A.3d 20, 45 (Conn. 2019) ("Insider reverse veil piercing is applicable to cases in which the plaintiff is a corporate insider seeking to disregard the corporate form for his own benefit.").

[88] *Sky Cable*, 886 F.3d at 385; *C.F. Tr., Inc. v. First Flight, L.P.*, 306 F.3d 126, 134 (4th Cir. 2002).

*Champlain Transp. Co.*[89]  There, the court considered a trial court order allowing a judgment creditor to seize property of a subsidiary controlled by the judgment debtor in satisfaction of the judgment.[90]  In refreshingly short order, Judge Hand found that reverse veil-piercing was not warranted.  In doing so, he observed that the subsidiary had not "interpose[d] in any way in the conduct of [the parent's] affairs."[91]  He also emphasized that "[s]o long as the law allows associated groups to maintain an independent unity, its sanction is not so easily evaded, and persons dealing with either do so upon the faith of the undertaking of that one which they may select."[92]  And so began the reverse veil-piercing debate.  Since then, many courts have adopted the doctrine, while others have shied away.[93]

---

[89] *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265 (2d Cir. 1929).

[90] *Id*. at 266.

[91] *Id*. at 267.

[92] *Id*.

[93] *See, e.g.*, *Sky Cable*, 886 F.3d at 386–88 (concluding that Delaware would accept reverse veil-piercing); *Litchfield*, 799 A.2d 298 (accepting reverse veil-piercing); *C.F. Tr., Inc. v. First Flight L.P.*, 580 S.E.2d 806 (Va. 2003) (same); *LFC Mktg. Gp., Inc. v. Loomis*, 8 P.3d 841 (Nev. 2000) (same); *State v. Easton*, 647 N.Y.S.2d 904 (N.Y. Sup. Ct. 1995) (same); *Stoebner v. Lingenfelter*, 115 F.3d 576 (8th Cir. 1997) (same); *Permian Petrol. Co. v. Petroleos Mexicanos*, 934 F.2d 635 (5th Cir. 1991) (same).  *Contra Acree v. McMahan*, 585 S.E.2d 873 (Ga. 2003) (rejecting reverse veil-piercing); *Postal Instant Press, Inc. v. Kaswa Corp.*, 77 Cal. Rptr. 3d 96 (Cal. Ct. App. 2008) (same); *Cascade Energy and Metals Corp. v. Banks*, 896 F.2d 1557 (10th Cir. 1990) (same).

Courts declining to allow reverse veil-piercing have relied primarily, and understandably, on a desire to protect innocent parties. This is revealed in the two most often cited state court decisions rejecting reverse veil-piercing, *Acree v. McMahan*[94] and *Postal Instant Press, Inc. v. Kaswa Corp.*[95] In *Acree*, the Supreme Court of Georgia rejected reverse veil-piercing, holding that the risk reverse piercing would facilitate harm, through judicial decree, to innocent shareholders and third-party creditors could not adequately be managed by the courts.[96] In *Postal Instant Press,* a California appellate court rejected reverse veil-piercing on similar grounds.[97]

The concerns expressed in *Acree* and *Postal Instant Press* are well-founded. To start, reverse veil-piercing has the potential to bypass normal judgement collection procedures by permitting the judgment creditor of a parent to jump in front

---

[94] 585 S.E.2d at 874 ("We reject reverse piercing, at least to the extent that it would allow an 'outsider,' such as a third-party creditor, to pierce the veil in order to reach a corporation's assets to satisfy claims against an individual corporate insider."); *id*. at 874–75 (noting that the "particular concern" implicated by reverse piercing is not only harm to "non-culpable third-party shareholders" but also harm to other "[c]orporate creditors").

[95] 77 Cal. Rptr. 3d at 101 ("Our independent research and analysis lead us to reject outside reverse piercing."); *id*. at 103 (observing that "non-culpable shareholders" would be prejudiced by allowing reverse veil-piercing).

[96] *Acree*, 585 S.E.2d at 874–75.

[97] *Kaswa*, 77 Cal. Rptr. 3d at 102–04.

of the subsidiary's creditors.[98]  For obvious reasons, this dynamic would "unsettle

the expectations of corporate creditors who understand their loans to be secured . . .

by corporate assets" and could lead to corporate creditors "insist[ing] on being

compensated for the increased risk of default posed by outside reverse-piercing

claims."[99]  As (if not more) important, "to the extent that the corporation has other

non-culpable shareholders, they obviously will be prejudiced if the corporation's

assets can be attached directly."[100]  Courts rejecting reverse veil-piercing have

emphasized that the risk of harm to innocent stakeholders is often avoidable because

judgment creditors can invoke other claims and remedies to achieve the same

outcome.[101]

The risks that reverse veil-piercing may be used as a blunt instrument to harm

innocent parties, and to disrupt the expectations of arms-length bargaining, while

real, do not, in my view, justify the rejection of reverse veil-piercing outright.

---

[98] *Cascade*, 896 F.2d at 1577.

[99] *Floyd v. I.R.S. U.S.*, 151 F.3d 1295, 1299 (10th Cir. 1998).

[100] *Cascade*, 896 F.2d at 1577.  As was the case in *Kingston*, the backdrop often animating these concerns is the very real possibility that, in many instances, the subsidiary itself has not engaged in any wrongdoing.  *See Kingston*, 31 F.2d at 267.

[101] *Cascade*, 896 F.2d at 1577 ("[W]e are inclined to conclude that more traditional theories of conversion, fraudulent conveyance of assets, respondeat superior and agency law are adequate to deal with situations where one seeks to recover from a corporation for the wrongful conduct committed by a controlling stockholder without the necessity to invent a new theory of liability.").

Rather, the recognition of the risks creates an opportunity to manage them, and to do so in a manner that serves the interests of equity.[102]

In *C.F. Trust, Inc. v. First Flight L.P.*, the Supreme Court of Virginia adopted reverse veil-piercing upon observing that, at their most basic level, traditional and reverse veil-piercing claims both seek to prevent the same sort of wrongdoing: abuse of the corporate form and fraud.[103] The court recognized the risk that reverse veil-piercing could negatively impact innocent third-parties and defined the reverse veil-piercing standard expressly to manage that risk.[104] Specifically, the court held that a plaintiff asking the court to authorize reverse veil-piercing, in addition to proving the elements required to justify traditional veil-piercing, must also demonstrate that reverse veil-piercing will not cause harm to "innocent investors . . . [or] innocent

---

[102] *See, e.g.*, *Mattingly L. Firm, P.C. v. Henson*, 466 P.3d 590, 596 (Okla. Civ. App. 2019) ("We also acknowledge, however, that these concerns may be lessened or eliminated in the presence of particular facts, such as 'where a corporation is controlled by a single shareholder [and] there are . . . no third-party shareholders to be unfairly prejudiced by disregarding the corporate form.'" (alteration in original) (citation omitted)).

[103] 580 S.E.2d at 810–11; *see also Comm'r of Env't Prot. v. State Five Indus. Park, Inc.*, 37 A.3d 724, 741 (Conn. 2012) ("Put differently, if an individual and a corporation are indistinguishable by virtue of the individual's own acts, the corporate veil should be subject to piercing in either direction. Thus, both traditional piercing and reverse piercing attempt to rectify the same inequity . . . .").

[104] *C.F. Tr.*, 580 S.E.2d at 811.

30

secured and unsecured creditors," and that there are no other legal or equitable remedies "availab[le] . . . [for] the creditor [to] pursue."[105]

Similarly, in *In re Phillips*, the Supreme Court of Colorado determined that outside reverse veil-piercing claims must be permitted when justice so requires "[d]ue to the similarities and parallel goals achieved in outside reverse piercing and traditional piercing."[106]  The court then clarified that, in evaluating reverse veil-piercing claims, courts must first make the traditional determinations of whether the subsidiary is an alter ego of the parent and whether the subsidiary is being used in perpetration of fraud or injustice.[107]  Then the court must assess whether there is an inequitable result that can be remedied by piercing.[108]  And finally, before authorizing the piercing, the court must consider whether innocent shareholders or creditors would be prejudiced as a result of the piercing.[109]

---

[105] *Id.*; *see also Loomis*, 8 P.3d at 847 (noting that "there are other equities to be considered in the reverse piercing situation—namely, whether the rights of innocent shareholders or creditors are harmed by the pierce").

[106] 139 P.3d 639, 645 (Colo. 2006) ("Due to the similarities and parallel goals achieved in outside reverse piercing and traditional piercing, we hold that Colorado law permits outside reverse piercing when justice so requires.").

[107] *Id.* at 646.

[108] *Id.*

[109] *Id.*

In the only case cited by the parties that purported to apply Delaware law, *Sky Cable*, the court likewise acknowledged the risks of reverse veil-piercing and then addressed how limits on the doctrine would adequately manage those risks.[110] As with other courts that have adopted reverse veil-piercing, the Fourth Circuit found it difficult to justify an outright rejection of the doctrine when "the same considerations that justify [traditional] piercing [of] the corporate veil" are at work to justify a plaintiff's request to "pierc[e] the veil in reverse."[111] In the traditional veil-piercing context, Delaware courts have forcefully stated that "Delaware has a powerful interest of its own in preventing the entities that it charters from being used as vehicles for fraud. Delaware's legitimacy as a chartering jurisdiction depends on it."[112] With this in mind, the *Sky Cable* court noted that if reverse veil-piercing was not available, such that an alter ego entity could not be held liable for its member's debts under any circumstance, "fraudulent members could hide assets in plain sight to avoid paying a judgment."[113] To address this unacceptable outcome, the court held that where: (1) an LLC has a single member, (2) that LLC is the member's alter ego, and (3) that member is using the LLC as a fraudulent shield against judgment

---

[110] *Sky Cable*, 886 F.3d at 387.

[111] *Id.* (alteration in original) (internal quotations omitted).

[112]  *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 26 (Del. Ch. 2009).

[113] *Sky Cable*, 886 F.3d at 387.

creditors, reverse veil-piercing is a tool available to the court to avoid fraud and injustice when other legal and equitable means are unavailing.[114]

Delaware embraces and will protect "corporate separateness"[115]; but Delaware will not countenance the use of the corporate form as a means to facilitate fraud or injustice.[116] Mindful of the need to balance these important policies, and taking the lead from *First Flight*, *Phillips* and *Sky Cable*, I am satisfied there is a place for a carefully circumscribed reverse veil-piercing rule within Delaware law.[117]

---

[114] *Id.* at 387–88.

[115] *See NAMA Hldgs, LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014) ("Delaware law respects corporate separateness"); *Pauley Petrol., Inc. v. Cont'l Oil Co.*, 231 A.2d 450, 454 (Del. Ch. 1967) ("[T]he law must and does respect the separateness of the corporate entity. . . ."). This notion of "corporate separateness" includes, of course, the presumptive understanding that "shareholders in a corporation are not liable for the obligations of the enterprise beyond the capital that they contribute in exchange for their shares." Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1039 (1991).

[116] *NACCO Indus.*, 997 A.2d at 26; *see also Martin v. D.B. Martin Co.*, 88 A. 612, 614 (Del. Ch. 1913) ("[T]he fiction of a legal corporate entity should be ignored when it has been used as a shield for fraudulent or other illegal acts."); *Paul v. Univ. Motor Sales Co.*, 278 N.W. 714, 720 (Mich. 1938) (noting that corporate separateness will be set aside if "the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime," in which cases "the law will regard the corporation as an association of persons" individually liable for the acts of the entity); *cf. In re Massey Energy Co.*, 2011 WL 2176479, at *20 (Del. Ch. May 31, 2011) ("Delaware law does not charter law breakers.")

[117] *Kingston*, 31 F.2d at 267 (noting that the instances where reverse veil-piercing might be justified "must be extremely rare").

33

In defining the rule, I begin by stressing that I am not endorsing "insider" reverse veil-piercing.[118] The rule stated here applies only to "outsider" reverse veil-piercing. Also at the threshold, it must be emphasized that, just like with traditional veil-piercing, reverse veil-piercing should be sanctioned only in the most "exceptional circumstances."[119] The framework outlined here to evaluate reverse veil-piercing claims comes with an express recognition that such claims, if not guided by appropriate standards, can threaten innocent third-party creditors and shareholders and lead to a host of unpredictable outcomes for these constituencies.[120] Only in cases alleging egregious facts, coupled with the lack of real and substantial

---

[118] I note that commentators and courts take different views of insider reverse piercing. *See* David G. Epstein & Jake Weiss, *The Fourth Circuit, "Suem" and Reverse Veil Piercing in Delaware*, 70 S.C. Law Rev. 1189, 1207–08 (Summer 2019) (observing that most "courts and commentators" agree that inside reverse veil piercing is not sustainable since there is no equity to be served by "allowing a company's veil to be pierced for the benefit of the individuals who themselves have created the company" (citation omitted)). *But see* Gregory S. Crespi*, The Reverse Pierce Doctrine: Applying Appropriate Standards*, 16 J. Corp. L. 33, 69 (1990) ("Crespi") (endorsing a rule that would allow "insider" reverse veil-piercing in limited circumstances). To be clear, I am not endorsing or rejecting "insider" reverse veil-piercing because that claim is not implicated here.

[119] *Vichi*, 62 A.3d at 49.

[120] *See Cascade*, 896 F.2d at 1577; Crespi, at 64 (observing that outside reverse veil-piercing "will prevent the shareholders of a corporation from shielding corporate assets from claims against a controlling insider; as a result, the general expectations of investors that their corporations will be free from liability for claims against corporate insiders may be impaired," thereby "reduc[ing] the usefulness of the corporate form as a vehicle for raising and deploying capital"); *id*. at *64–65 (noting that the "existing body of corporate disregard jurisprudence in the standard corporate creditor veil-piercing context is consequently [] more applicable here than in the insider reverse piercing context").

prejudice to third parties, should the court even consider utilizing the reverse veil-piercing doctrine.[121]  With prejudice to third-parties in mind and a framework designed to deal with such concerns, however, reverse veil-piercing can act as a deterrent to owners of companies, particularly those that are closely held, from shuffling their assets among their controlled entities with the express purpose of avoiding a judgment.

The natural starting place when reviewing a claim for reverse veil-piercing are the traditional factors Delaware courts consider when reviewing a traditional veil-piercing claim—the so-called "alter ego" factors that include insolvency, undercapitalization, commingling of corporate and personal funds, the absence of corporate formalities, and whether the subsidiary is simply a facade for the owner.[122] The court should then ask whether the owner is utilizing the corporate form to perpetuate fraud or an injustice.[123] This inquiry should focus on additional factors, including "(1) the degree to which allowing a reverse pierce would impair the legitimate expectations of any adversely affected shareholders who are not

---

[121] *Sky Cable, LLC v. Coley*, 2016 WL 3926492, at \*1 (W.D. Va. July 18, 2016) (adopting reverse veil-piercing, in part, because "[t]he facts of [the] case [were] egregious").

[122] *See Doberstein*, 2015 WL 6606484, at \*4; *see also Litchfield*, 799 A.2d at 311 (observing that "the direction of the piercing was immaterial where the general tests supporting it ha[ve] been met").

[123] *Doberstein*, 2015 WL 6606484, at \*4.

responsible for the conduct of the insider that gave rise to the reverse pierce claim, and the degree to which allowing a reverse pierce would establish a precedent troubling to shareholders generally; (2) the degree to which the corporate entity whose disregard is sought has exercised dominion and control over the insider who is subject to the claim by the party seeking a reverse pierce; (3) the degree to which the injury alleged by the person seeking a reverse pierce is related to the corporate entity's dominion and control of the insider, or to that person's reasonable reliance upon a lack of separate entity status between the insider and the corporate entity; (4) the degree to which the public convenience, as articulated by [the Delaware General Corporation Law and Delaware's common law], would be served by allowing a reverse pierce; (5) the extent and severity of the wrongful conduct, if any, engaged in by the corporate entity whose disregard is sought by the insider; (6) the possibility that the person seeking the reverse pierce is himself guilty of wrongful conduct sufficient to bar him from obtaining equitable relief"; (7) the extent to which the reverse pierce will harm innocent third-party creditors of the entity the plaintiff seeks to reach; and (8) the extent to which other claims or remedies are practically available to the creditor at law or in equity to recover the debt.[124]  Fundamentally,

---

[124] Crespi, at 68.  I recognize that, as a practical matter, the consideration of whether the reverse pierce will cause harm to innocent third parties will substantially limit the doctrine's application.  *See id.* ("A review of the case law suggests that most, if not all, outsider reverse piercing claims will be denied if the above standards are reasonably applied regardless of the precise balance struck among the factors."); *see also id.* at 69

reverse veil-piercing, like traditional veil-piercing, is rooted in equity, and the court must consider all relevant factors, including those just noted, to reach an equitable result.[125]

Applying this framework, Delaware courts will be well-equipped to handle the varying concerns courts and commentators have rightfully expressed regarding reverse veil-piercing. The expectations of third-party creditors and investors will be well-protected.[126] And the "public convenience" factor will require "the balancing of the social value of upholding the legitimate expectations of the affected corporate creditors or debtors, applying a rebuttable presumption in favor of assuring such expectations, against the importance of the policies served by allowing a reverse pierce under the particular circumstances involved."[127]

---

("The proper scope of this equitable doctrine . . . would appear to be limited to closely held firms in which a single insider, or a small group of insiders acting in concert, holds all or virtually all economic claims."). Borrowing from our "bad faith" jurisprudence in the fiduciary duty context, the case meeting this rigid framework for reverse veil-piercing can safely be classified as a "rare bird." *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016) (describing a finding of bad faith as "a rara avis" or "rare bird" in the fiduciary duty context). Of course, the fact the doctrine will rarely be invoked by the court to reach assets does not suggest that it should be unavailable to aggrieved creditors in all instances as a matter of law.

[125] *See C.F. Tr.*, 580 S.E.2d at 810.

[126] *Cascade*, 896 F.2d at 1577.

[127] Crespi, at 51.

## 2. Plaintiffs' Reverse Veil-Piercing Claim Is Well-Pled

After carefully reviewing the Complaint, I am satisfied this is one of those "exceptional circumstances" where a plaintiff has well pled a basis for reverse veil-piercing. It is at least reasonably conceivable that the SourceHOV Subsidiaries are alter egos of SourceHOV Holdings and that the subsidiaries have actively participated in a scheme to defraud or work an injustice against SourceHOV Holdings creditors, like Plaintiffs, by diverting funds that would normally flow to SourceHOV Holdings away from that entity to Exela. At this stage, from the well pled allegations in the Complaint, I see no innocent shareholders or creditors of the SourceHOV Subsidiaries that would be harmed by reverse veil-piercing, nor any potential alternative claims at law or in equity, as against the SourceHOV Subsidiaries or SourceHOV Holdings itself, that would for certain remedy the harm.[128]

Beginning with the "alter ego" factors, as previously discussed, the Complaint well-pleads facts that allow a reasonable inference that SourceHOV Holdings is insolvent and that it is undercapitalized.[129] The Complaint also pleads a reasonably conceivable basis to conclude that corporate formalities have not been maintained

---

[128] In other words, it is reasonably conceivable that reverse veil-piercing will be the only means by which Plaintiffs may collect the Appraisal Judgment.

[129] Compl. ¶¶ 8, 82, 84.

since the Merger. As alleged, all of the Exela entities, including SourceHOV Holdings and the SourceHOV Subsidiaries, have overlapping personnel and directors[130] and share the same offices;[131] many of the SourceHOV Subsidiaries do not have updated corporate registrations;[132] the entities have failed to maintain accurate or complete corporate records;[133] Exela must give its approval before SourceHOV Holdings can pay debts;[134] and all Exela-related entities have been collectively referred to as one Exela-controlled enterprise in SEC filings.[135]

Turning to the broader fraud or injustice inquiry, the question here is whether the subsidiaries are being used to perpetuate fraud or injustice against a judgment creditor of their parent. Certain of the SourceHOV Subsidiaries' active participation in a potential fraudulent or unjust scheme, as pled, is evident with a glance at the First Tier Purchase and Sale Agreement associated with the A/R Facility.[136] Under

---

[130] Compl. ¶¶ 78, 130 ("Shirkant Sortur on July 12, 2017, signed onto an agreement as authorized signatory for thirty-eight difference SourceHOV subsidiaries in connection with Exela's $1.35 billion in financing . . . .").

[131] Compl. ¶ 125.

[132] Compl. ¶ 126.

[133] Compl. ¶ 132.

[134] Compl. ¶ 133.

[135] Compl. ¶ 131.

[136] Compl. ¶ 138.

this agreement, thirteen of the SourceHOV Subsidiaries sold their receivables to another one of Exela's indirect subsidiaries.[137] The Complaint alleges that the managers of these SourceHOV Subsidiaries knew about SourceHOV Holdings' inadequate capitalization and, knowing that certain of their proceeds would otherwise go to the judgment creditors of SourceHOV Holdings, they actively "divert[ed] assets away from SourceHOV by pledging certain accounts receivable as collateral for a $160 million accounts receivable security facility."[138] As mentioned in the discussion of traditional veil-piercing, discovery will bear out whether (or not) Plaintiffs accurately describe the mechanics and purpose of the A/R Facility in the Complaint. For now, accepting those allegations as true, it is reasonably conceivable that certain SourceHOV Subsidiaries used the A/R Facility to prevent their proceeds from going to SourceHOV Holdings' judgment creditors. Specific allegations of intentional acts aimed at avoiding judgments through the use of legal constructs are sufficient to well plead fraud under traditional veil-piercing, and the review of such pled facts in support of a reverse veil-piercing claim is no different.[139]

---

[137] *Id.*

[138] Compl. ¶ 28.

[139] *Compagnie des Grands Hotels*, 2019 WL 148454, at *5 ("Acts intended to leave a debtor judgment proof are sufficient to show fraud and injustice").

Finally, the Complaint well pleads a bases to infer that Plaintiffs will be able to satisfy the additional elements to sustain a reverse veil-piercing claim. I address them briefly in turn.

**Impairment of expectations of adversely affected shareholders.** The Complaint pleads no basis to infer that other owners of SourceHOV Holdings or the SourceHOV Subsidiaries will be adversely affected by reverse veil-piercing. The SourceHOV Subsidiaries indirectly are wholly owned by SourceHOV Holdings, which in turn is wholly-owned by Exela.[140] Thus, all entities involved in the alleged scheme to starve SourceHOV Holdings of funds are connected by unified ownership.[141]

**The exercise of dominion and control and degree to which that caused Plaintiffs' injury.** According to the Complaint, Exela and certain of the SourceHOV Subsidiaries agreed to the A/R Facility without the involvement or consent, and to the detriment of, the dormant SourceHOV Holdings.[142] This allows

---

[140] Compl. ¶¶ 82–84.

[141] *Kingston*, 31 F.2d at 267 (noting that reverse veil-piercing may be appropriate when the subsidiary "interpose[s] … in the conduct of [the parent's] affairs"); Compl. ¶ 138; OB at 1 ("[SourceHOV Holdings] owns 100% of the membership interests of SourceHOV, LLC, which in turn owns several profitable portfolio companies.").

[142] Compl. ¶ 28.

a pleading-stage inference of dominion and control causing injury to Plaintiffs sufficient to justify reverse veil-piercing.

**The public convenience as articulated by the DGCL and Delaware Common Law.** As noted at the outset, Delaware's statutory appraisal scheme eliminated the minority stockholder's common law right to prevent a merger and replaced it with a mandatory statutory right to obtain the fair value of what is to be taken from the minority stockholder via the merger (his shares) over his dissent. Plaintiffs allege, "Exela and SourceHOV have retained all of the benefits of the [Merger] at issue in the Appraisal Action without paying compensation for Plaintiffs' dissenting shares and are using their corporate structure as a sham in an attempt to render SourceHOV 'judgment proof.'"[143] The Complaint then alleges that the scheme by which the SourceHOV Subsidiaries have agreed to channel funds directly to Exela is "fundamentally inequitable because Exela's own financial statements recognize the [Appraisal] Judgment as ultimately *Exela's* liability, given its 100% control over SourceHOV."[144] Reverse veil-piercing, in this circumstance, would serve the public convenience as expressed in Delaware's appraisal statute.

---

[143] Compl. ¶ 2.

[144] Compl. ¶ 3 (emphasis in original).

**The extent of the wrongful activity.** The Complaint well-pleads that Exela and the SourceHOV Subsidiaries (with SourceHOV Holdings' acquiescence) have initiated a scheme to ensure that Exela retains the significant value of Plaintiffs' ownership in pre-Merger SourceHOV Holdings, interest taken over Plaintiffs' dissent to the Merger, without paying a nickel for that equity. If true, this is the sort of wrongful conduct that justifies reverse veil-piercing.

**Plaintiffs' wrongful conduct.** There is no basis in the Complaint to infer that Plaintiffs themselves have engaged in wrongful conduct that would disable them from calling upon equity to address their harm. They lawfully dissented to the Merger, properly sought statutory appraisal of their SourceHOV Holdings shares, prevailed at trial, prevailed on appeal, obtained a final judgment and diligently sought to execute on that judgment.

**Harm to innocent third-party creditors.** There is no basis in the Complaint to infer that reverse veil-piercing will cause harm to innocent third-party creditors. In this regard, Defendants argue that because the SourceHOV Subsidiaries are primary obligors on certain debt at a level above SourceHOV Holdings, those debt holders will be prejudiced if SourceHOV Holdings' judgment creditors can hold those subsidiaries liable for the Appraisal Judgment.[145]   To be clear, factual

---

[145] Defs.' Reply Br. in Supp. of Mot. to Dismiss the Verified Compl. (D.I. 17) at 10.

43

allegations related to SourceHOV Holdings' or the SourceHOV Subsidiaries' third-party creditors are not in the Complaint, and for now at least, my analysis is confined to the "four corners" of that pleading.[146]

**Other claims or remedies at law or equity.** As for the existence of other claims or remedies, it does not appear that other remedies exist to serve the ultimate purpose the reverse veil-piercing claim is meant to serve here: to enforce the Charging Order held against SourceHOV Holdings. While certain jurisdictions consider the availability of "conversion, fraudulent conveyance of assets, respondeat superior and agency law" as relevant when considering this factor, no such argument has been developed here apart from a reference to the existence of such remedies in other jurisdictions.[147] In any event, it is not clear at this nascent stage of the proceedings that enforcement of the properly placed Charging Order can be achieved through means other than reverse veil-piercing. With that said, it may well be that Defendants will be able to demonstrate that traditional judgment collection measures are adequate and that reverse piercing, therefore, would be unnecessarily extreme

---

[146] *Malpiede*, 780 A.2d at 1090; *see also Savor,* 812 A.2d at 896–97 (noting that the trial court may not speculate as to facts that may be developed in discovery when adjudicating a motion to dismiss the complaint).

[147] *Floyd*, 151 F.3d at 1299; OB at 20.

44

and inappropriate.[148]  But, for now, I see no reason to dismiss the claim on the basis that some other (as yet to be identified) means to collect the Appraisal Judgment may be available to Plaintiffs.[149]

### 3. The Charging Order Does Not Prohibit Reverse Veil-Piercing

Section 18-703(d) provides that when a judgment creditor obtains a charging order with respect to a member's LLC interests, that order functions as the exclusive remedy by which the judgment creditor may satisfy its judgment.[150]  The statute explicitly prohibits a judgment creditor from pursuing claims for "attachment, garnishment, foreclosure or other legal or equitable remedies" against the judgment

---

[148] *Cascade*, 896 F.2d at 1577 (expressing concerns about using reverse veil-piercing to "bypass[] normal judgment-collection procedures").

[149] I note that courts and commentators have focused on a number of other concerns that have no bearing on reverse veil-piercing's application in this case, so I need not address them.  *First*, some argue that reverse veil-piercing is not appropriate when the plaintiff is a voluntary contractual creditor rather than a judgment creditor. *Floyd*, 151 F.3d at 1299–1300.  Here, Plaintiffs are judgment creditors.  *Second*, some argue that a reverse veil-piercing plaintiff should not get to attach a corporation's assets directly and then force a sale of those assets. *Id.* at 1299 ("[T]hird parties may be unfairly prejudiced if the corporation's assets can be attached directly.").  Plaintiffs have not sought a forced sale of any of the SourceHOV Subsidiaries or any of their assets. *Third*, there is a concern that innocent shareholders will be prejudiced if reverse veil-piercing is permitted in cases where the judgment debtor merely controls rather than owns shares in the company to be reached by the pierce.  Ariella M. Lvov, *Preserving Limited Liability: Mitigating the Inequities of Reverse Veil Piercing with A Comprehensive Framework*, 18 U.C. Davis Bus. L.J. 161, 179 (2018).  This case regards ownership not mere control.

[150] 6 *Del. C.* § 18-703(d).

debtor's interest in the LLC.[151]   The canon of construction, *ejusdem generis*, provides that "where general language follows an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned."[152] So construed, the phrase "other legal or equitable remedies" in Section 18-703(d) is modified by the specific list of remedies mentioned before that phrase.   And the remedies listed "involve traditional common law actions by which a creditor may seize particular property of a debtor."[153]

This construction makes perfect sense; each of the enumerated remedies are other means by which to force the judgment debtor to pay a creditor's judgment and, thus, would be displaced by the exclusive statutory remedy of the charging order. The reverse veil-piercing claim, as asserted here, does not rest on or invoke a remedy other than the charging order; it, instead, seeks a judicially sanctioned expansion of the entities against whom the Charging Order may be enforced.   In other words, if the court determines that the SourceHOV Subsidiaries fall under the purview of the

---

[151] *Id.*

[152] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265 (Del. 2004) (citation omitted).

[153] *Sky Cable*, 886 F.3d at 388.

Charging Order, then Plaintiffs' only remedy against those entities would still be enforcement of the Charging Order. Any attempt to pursue separate legal or equitable claims, or to seek attachment, garnishment or foreclosure against any one of those entities would be barred by statute.

The implication of a successful reverse veil-piercing claim here, as pled, is that the SourceHOV Subsidiaries are alter egos of SourceHOV Holdings and that "the ultimate part[ies] in interest, the [subsidiaries], [should] be regarded in law and fact as the sole party in a particular transaction."[154] If Section 18-703(d)–(e) prevented the application of reverse veil-piercing, judgment debtors, their parents and their subsidiaries would be incentivized to facilitate the movement of funds from parent to subsidiary, and perhaps back again, to avoid a judgment against the entity in between.[155] There is no basis to conclude the General Assembly intended that result when it enacted the charging order statute.

## E. Plaintiffs' Unjust Enrichment Claim Fails to State a Claim

Unjust enrichment is defined as "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental

---

[154] *Pauley Petrol. Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968).

[155] *Sky Cable*, 886 F.3d at 389.

47

principles of justice or equity and good conscience."[156] Plaintiffs allege Exela was enriched by obtaining all of SourceHOV Holdings assets without paying full compensation by virtue of the failure to pay for Plaintiffs' dissenting shares.[157] They further allege SourceHOV Holdings' failure to pay the approximately $57 million Appraisal Judgment resulted in an impoverishment to Plaintiffs because that was money owed to them as the fair value of the property that has been taken from them.[158]

For its part, Exela argues that it was not enriched, but rather impoverished, as a result of the Merger, the Appraisal Action and the Appraisal Judgment.[159] More relevant here, Exela also argues that Plaintiffs unjust enrichment claim fails because they have an adequate (and exclusive) remedy in the form of the Charging Order against SourceHOV Holdings.[160] On this latter point, I agree.

---

[156] *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del.1988); *see also Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (laying out the elements of unjust enrichment).

[157] Compl. ¶ 65.

[158] Compl. ¶ 71.

[159] OB at 24–25 (maintaining that the Merger was not accretive, and that the Appraisal Action and Appraisal Judgment have only exacerbated the losses).

[160] OB at 24–26.

Plaintiffs cite *Mehta v. Smurfit-Stone Container Corp.* in support of their unjust enrichment claim.[161] There, a shareholder who notified the company it would seek statutory appraisal of its shares in dissent of a merger ultimately failed to perfect its appraisal rights in the statutorily required 120-day period.[162] Notwithstanding the failure to seek appraisal, Rock-Ten withheld the merger consideration from the plaintiff, arguing the stockholder made its election and yet failed to execute on its appraisal right through no fault of the company.[163] The court held the denial of merger consideration to the plaintiffs amounted to an enrichment of Rock-Ten because it received the full benefit of its bargain by merging with Smurfit-Stone, yet had not paid the full price it agreed to pay (by withholding consideration to the dissenting shareholders).[164]

Unlike in *Mehta*, where the plaintiff might not have had any legal claim or remedy by which to recover the merger consideration owed to it, Plaintiffs have an adequate remedy in the form of the Appraisal Judgment and Charging Order. That order provides that, to the extent any dollar flows through SourceHOV Holdings by distribution from a subsidiary, it must first be paid to Plaintiffs before flowing up to

---

[161] 2014 WL 5438534, at *4 (Del. Ch. Oct. 20, 2014).

[162] *Id.*

[163] *Id.* at *5.

[164] *Id.*

49

Exela. Plaintiffs argue the Charging Order clearly is not adequate because the judgment has not yet been paid. But, in this context, that is not what adequacy means. "[T]o be 'adequate,' a [] remedy must be available as a matter of right, be full, fair and complete, and be as practical to the ends of justice and to prompt administration as the remedy in equity."[165] A charging order, as a remedy, was practically available to Plaintiffs and they, in fact, sought and received that remedy. The fact the Charging Order has yet to deliver satisfaction does not mean it is legally inadequate.

Moreover, the charging order statute declares that the charging order is the judgment creditor's exclusive remedy under the circumstances.[166] The unjust enrichment claim is not merely an action to expand the Charging Order's application to other entities, as is the case with the veil-piercing claims; it is a claim that, if successful, will side-step the Charging Order completely as a means to obtain a new judgment on a new claim. The "exclusive remedy" language of the statute prevents that result. Accordingly, Plaintiffs' unjust enrichment claim must be dismissed.

---

[165] *Travelers Cas. & Sur. Co. of Am. v. Colonial Sch. Dist.*, 2001 WL 287482, at *3 (Del. Ch. Mar. 16, 2001) (citation omitted).

[166] 6 *Del. C.* § 18-703(d); *see also* 6 *Del. C.* § 18-703(e) ("No creditor of a member or of a member's assignee shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company.").

### III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss is GRANTED as to Count I but DENIED as to Count II.

**IT IS SO ORDERED.**